# EXHIBIT 2

## Golden Gate Reporting

IN THE UNITED STATES DISTRICT COURT FOR

THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


David Davis and Page      Case No.:  C 07-3365 EDL
Gearhart-Davis PRO SE,

            Plaintiffs,

    vs.

Clearlake Police
Department,

            Defendant.
_____/


DEPOSITION OF DAVID DAVIS




DATE:         May 6, 2008


TIME:         10:33 a.m.


LOCATION:     600 Administration Drive
              Law Library, Room 213 J
              Santa Rosa, California 95401

REPORTED BY:  Cindy L. Boccaleoni
              Certified Shorthand Reporter
              License Number 12987

# Golden Gate Reporting

Page 2

1                    A P P E A R A N C E S

2

3    For the Plaintiffs:

4           David Davis, Pro Se

5           P.O. Box 3225
            Clearlake, California 95422
6

7    For the Defendants:

8           DALE L. ALLEN, JR., ESQ.

9           LOW, BALL & LYNCH
            505 Montgomery Street, 7th Floor
10          San Francisco,California 94111-2584
            (415) 981-6630
11          (415) 982-1634
            DAllen@lowball.com

12

13                    --oOo--

14

15

16

17

18

19

20

21

22

23

24

25

Golden Gate Reporting

Page 3

1                    I N D E X

2

3    EXAMINATION BY:                    PAGE:

4         MR. ALLEN                      4

5

6              E X H I B I T S

7    Defendant's Exhibit:

8                   None marked

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Golden Gate Reporting

1    was involved in an accident in, I want to say,

2    March or April of 2006, which Celli said he had

3    never met me nor seen me before, which he was the

4    officer on the scene.  It's on, once again,

5    another complaint.

6         Q.  Let me back that up.

7         A.  Okay.

8         Q.  You said you'd been living in Clearlake

9    three -- approximately three to three and a half

10   years.  Can you give me approximately the month

11   or the season you moved to Clearlake?  So like

12   was it in the spring or the fall or the winter of

13   2005, 2006, March of 2005, 2006?  Can you give me

14   some sense of when you moved there?

15        A.  We have always came back and forth

16   fixing up one of our houses, and we had

17   initially, I want to say, moved out there

18   probably around October or November of '06 -- I'm

19   not for sure.  It could possibly be '06, I want

20   to say.

21        Q.  Early '06?

22        A.  No, late.  I just said --

23        Q.  Spring, summer '06?

24        A.  October, something October.

25        Q.  Well, the incident occurred in August of

Golden Gate Reporting

Page 21

1      '06.  That's why I'm thinking that you lived

2      there.

3            A.  Well, it had to be '05, then.  Excuse

4      me.  My bad.  That was an honest mistake.  Honest

5      mistake.

6            Q.  It's understandable.  What I'm trying --

7            A.  I understand you're -- what you're

8      trying to nail and what you're trying to get at.

9            Q.  Let me try and explain something here.

10           A.  Okay.

11           Q.  All I'm here today to do, which I'm

12     entitled to do under the law --

13           A.  Okay.

14           Q.  -- is to question you, to get as much --

15           A.  Yeah, I -- that's perfectly fine.

16           Q.  -- to get as much background information

17     as I can to find out the facts supporting your

18     claims --

19           A.  Okay.

20           Q.  -- what you believe are the facts

21     supporting your claims.

22           A.  All right.

23           Q.  This is just a question-and-answer

24     period.  It is an interrogation that we're

25     allowed under civil law.  It's not meant to be

3dabddcd-37dd-4dfe-8aee-03cd38734669

## Golden Gate Reporting

1    incident occurred on August 3rd, 2006?

2        A.   Well, actually, the first incident

3    occurred August 2nd, but initial complaint was

4    never filed, but I did speak with -- I believe it

5    was Captain Larsen.

6        Q.   Okay.  I stand corrected.  Your

7    complaint does mention October 2nd, 2006.

8        A.   Yes.

9        Q.   So here's what I want to do.  Between

10   September of 2005 and August 2nd, 2006, were

11   there any -- did you have any contacts with the

12   Clearlake Police Department?

13       A.   Yes, I did.

14       Q.   Okay.  Can you list them for me and the

15   approximate time; so the approximate time and

16   what the incident was?

17       A.   Okay.  My first encounter was when I was

18   involved in an incident.  A gentleman had, I

19   believe, stole something out of the store, and he

20   was running across the street, and he ran into my

21   car traveling down Lakeshore Boulevard.  And

22   Sergeant Celli, along with a few other officers,

23   had arrived on the scene.  An ambulance came.

24   Highway patrol came.  But needless to say, I was

25   found not to be at fault for that incident.

Golden Gate Reporting

Page 24

1          And let me see.  Any other encounters?

2     Oh, yeah.  Another encounter was I was pulled

3     over by another officer who just gave me a

4     warning for excessive music.

5          Q.  Do you remember when that was,

6     approximately?

7          A.  To be honest with you, no.

8          Q.  But it would have been --

9          A.  I just, you know, recall the incidents

10    and encounters I had with the Clearlake police

11    officers.

12         Q.  Okay.  And do you remember that

13    officer's name?

14         A.  No, I don't.

15         Q.  And just to be clear, this would be

16    before August of '06?

17         A.  Yes.

18         Q.  Do you remember if it was a man or a

19    woman?

20         A.  It was a man.

21         Q.  Do you know what time it --

22    approximately the time of day?

23         A.  I know it was during the daytime, so I

24    don't know if that's considered morning, evening,

25    afternoon shift.

Golden Gate Reporting

1        Q.   "Daytime" is fine.

2             What vehicle were you driving?

3        A.   My root-beer-brown Cougar.

4        Q.   So prior to August 2nd, 2006, there were

5   at least two encounters.  Do you recall any other

6   encounters with Clearlake Police Department prior

7   to August of '06?

8        A.   I seen them just riding around, but, you

9   know, as far as, "Hey, come here.  What's your

10  name?  You look suspicious," no.

11       Q.   Okay.  So the first -- in August -- on

12  August 2, 2006, Clearlake Police Department

13  officers contacted you; is that correct?

14       A.   Yes, they approached me.

15       Q.   Okay.  What were you doing at the time?

16       A.   Well, as I pulled into the gas station,

17  I noticed two officers had a gentleman pulled

18  over in a truck.  I got out of my vehicle.  Page

19  went into the gas station to pay for the gas.  I

20  believe it was like 25, $30.  I was filling the

21  tank up.

22            And she came out and put the gas nozzle

23  in the vehicle.  As it was pumping -- and we were

24  standing on the side watching these officers as I

25  noticed him watching me.

3dabddcd-37dd-4dfe-8aee-03cd38734669

Golden Gate Reporting

Page 26

1      Q.   Mm-hmm.   Keep going.

2      A.   One of them approached me, asked me, "Is

3    this your car?  Do you live out here?  What are

4    you doing out here?  Do you have driver's

5    license, registration?"  I provided them with

6    license, proof of insurance, and showed them

7    proof that the vehicle was, in fact, in the

8    process of being registered.

9           And then that's when the whole thing

10   brought on about, "Hey, we don't like your kind

11   out here," you know, "You need to move," you

12   know, as they admitted to in some of their

13   statements, which was later altered and changed.

14           I do admit that after those words, after

15   he told me that "We don't like your kind" and

16   that "You need to move," I took that very

17   offensively and felt that this officer was being

18   very unprofessional and disrespectful.

19           So I disrespected him back, not in a

20   threatening manner, just in a way as, "Hey, look.

21   You know, you just can't talk to people like that

22   because you're in a police uniform."  You can't

23   just walk up to people and tell them, "Hey, we

24   don't like you kind of people out here."  To me,

25   that's profiling.  That's racism right there, my

3dabddcd-37dd-4dfe-8aee-03cd38734669

Golden Gate Reporting

1    personal opinion, for somebody to tell you, "Hey,

2    we don't like your kind of people out here and

3    you need to move."

4        Q.  Do you remember the officer's name that

5    approached you first?

6        A.  To be honest with you, no, I don't.

7        Q.  Do you remember if it was Celli?  Was

8    Celli in uniform that night?

9        A.  Both officers were in uniform, and they

10   were in two separate cars.

11       Q.  Okay.  The officer that approached you,

12   was it the officer wearing the stripes, the one

13   who first walked up to you?

14       A.  To be honest with you, I don't recall.

15       Q.  Do you remember which officer made the

16   comments to you regarding "We don't like your

17   kind here"?

18       A.  Well, both -- Miller was the one that

19   initially started the whole "Hey, we don't like

20   you kind of people out here, and you need to

21   move."  And from that point, you know, it was

22   just a bunch of bickering and nagging going on.

23           To be honest with you, Dale, you know,

24   okay, fine.  You can bring up the point that hey,

25   you know, I'm a convicted felon.  But you also

Golden Gate Reporting

Page 28

1    have to take into account that, hey, a person

2    that's been in that situation avoids police

3    officers and any confrontations with the police.

4    That's obvious.  That's just from experience.

5    Hey, I don't want no problem with the police

6    officers, you know.

7         So hey, I provided them with everything

8    that was required, you know.  Celli says, "Hey"

9    -- all he wanted to know, "Hey, man.  Where is

10   your license plates?"

11        Well, in fact, there's no way you can

12   see the license plates on a 1967 Cougar.  There's

13   no way possible because in order to pump gas into

14   a 1967 Cougar, the license plates have to be

15   folded down, which the statements was later

16   changed in -- what was the officer's name, the

17   officer that was with Celli that night?  Miller,

18   the same officer who altered a tape from a court.

19        So, you know, it's not like, you know, I

20   approached these officers and just immediately

21   start harassing them.  I've never in my life

22   heard of anybody being approached while pumping

23   gas into a vehicle.

24        And hey, "We don't like you kind of

25   people out here."  I understand you're an

Golden Gate Reporting

Page 30

1   incident itself in a little more detail.

2        A.  All right.

3        Q.  One of the officers came up.  You can't

4   remember which of the two first approached you.

5   And they -- according to your complaint, you said

6   they asked for your driver's license,

7   registration and proof of insurance?

8        A.  Yes.

9        Q.  Prior to them -- that officer asking you

10   for that, did he say anything else to you?  Did

11   he say anything to you first?

12        A.  About the whole incident, the way he

13   approached me was, "Hey, is this your car?  Do

14   you live out here?  What are you doing out here?"

15   This is how the whole conversation started.

16   There was no conversation about no license plates

17   until after the whole fact, after they searched

18   my vehicle and everything.

19        Q.  All right.  So first officer comes up

20   and says, "Is this your car?  Do you live out

21   here?  What are you doing out here?"  What did

22   you say back?

23        A.  I told him I just moved out here.

24        Q.  Then what did the officer do?

25        A.  Got out of the car, started looking

3dabddcd-37dd-4dfe-8aee-03cd38734669

Golden Gate Reporting

Page 31

1    around the car.  By this time the other officer

2    walked up, looking around the car, looking inside

3    the car.  And at this time, this is when all the

4    verbal exchange -- verbal words started being

5    exchanged.  "Well, hey, we don't like you kind

6    out here."

7          And I asked him, "Well, what do you

8    mean, my kind, my kind of people?  What are you

9    trying to say?"  I took that offensively.

10         Q.  Okay.  Let me --

11         A.  I admit that.  I took that very

12   offensively.

13         Q.  What I want to do is just go step by

14   step at the moment, all right, so you get a

15   chance to explain all of this.  I'm going to go

16   step by step.

17         You mentioned that the first officer

18   comes up and asks you some questions about your

19   car and where you live, and you say you just got

20   out here.  You said that he got out of his car.

21   Did that first officer drive his car over towards

22   you, or did he walk over towards you?

23         A.  To be honest with you, I can't recall.

24         Q.  Okay.  After he walked over to you and

25   asked you the question and you said you just

Golden Gate Reporting

1    as far as my tattoos and his tattoos.  To be

2    honest with you, that's as far -- you know,

3    that's what I can recollect from that incident.

4        Q.  Okay.  At some point one of the officers

5    asked you for identification.  Do you remember

6    which officer asked you for identification?

7        A.  No, I do not.

8        Q.  Had Page come out of the store at that

9    point?

10        A.  Yeah.  She was on the side the whole

11    time.

12        Q.  And the officer asked you for

13    registration and insurance information?

14        A.  Yes.

15        Q.  Did they tell you why they were asking

16    you for that?

17        A.  No, they didn't.

18        Q.  After the officers took that

19    information, did one of them write you up for a

20    ticket?

21        A.  Yes.

22        Q.  Do you remember what the ticket was for?

23        A.  Unregistered vehicle and allegedly a

24    cracked windshield.

25        Q.  And the unregistered vehicle, you

Golden Gate Reporting

Page 40

1    mentioned earlier that you had -- you were in the

2    process of changing the registration?

3        A.   Well, Mr. Allen --

4        Q.   Or did I misunderstand that?  It's an

5    opportunity to explain.

6        A.   The way -- the way they got the

7    information off the vehicle was from the paper

8    that I showed them that the vehicle was in

9    process of being registered.

10       Q.   Okay.

11       A.   I requested from your clients a dispatch

12   record check that night.  And apparently there

13   was -- no dispatch had been done to verify any of

14   that.  So he just wrote the ticket up based up-

15   -- based upon the information I have from DMV.

16            But I also provided him with proof of

17   insurance and a driver license, which was not

18   actually a photo identification because I just

19   recently had my driver's license renewed.  You

20   know how they send you that piece of paper in the

21   mail and they said they give you four to six

22   weeks before you receive your actual photo ID in

23   the mail.  That was the identification, driver

24   license I provided to these officers that

25   particular night.

# Golden Gate Reporting

1     Q.  That -- let's go to the temporary

2  registration for the moment.  You had a temporary

3  registration certificate that you showed the

4  officers?

5     A.  No, it was not a temporary registration.

6  The officer asked me, "Do you have any proof to

7  show that the vehicle is at least in process of

8  being registered?"  And I provided him with it.

9     Q.  What was this process of registration

10  that you showed him?

11     A.  Well, I just had a new motor put in it

12  and a new exhaust system, and it was still in the

13  process of nonoperating -- it was back and forth

14  from the automotive shop, basically.

15     Q.  So did you --

16     A.  And it was money being tangled up in the

17  automotive shop and through DMV.  It was like

18  $255 owed.  The reason -- part of the cost was

19  because the license plates on the vehicle, the

20  person I purchased the vehicle from, they were

21  personalized license plates.

22     Q.  Do you know -- do you know what a permit

23  of non-operation is, a PNO?

24     A.  Yes, I do.

25     Q.  Okay.  Was this vehicle -- did this

Golden Gate Reporting

Page 42

1    vehicle hold a PNO at the time?

2        A.   No, I don't believe, no.

3        Q.   But the registration was expired on it?

4        A.   Yes.

5        Q.   And what you had was something you

6    showed them that you were in the process of

7    taking care of that expired registration?

8        A.   Yes, yes.

9        Q.   But it was not taken care of yet at the

10   time?

11       A.   That's what I stated.

12       Q.   Okay.  And then with -- you had

13   insurance?  You had a proof of insurance

14   certificate you showed them?

15       A.   Yes.

16       Q.   Do you still have that proof of

17   insurance?  Because -- let me back up for a

18   second.  In your complaint you attached an

19   exhibit, Exhibit A:  "Mercury Cougar was sold so

20   David Davis no longer has the registration and

21   insurance."

22            Do you have any evidence still at your

23   house where you have that vehicle's insurance on

24   August 2nd, '03 -- sorry -- August 2nd, '06?  Do

25   you have any evidence of the insurance policy in

Golden Gate Reporting

1    the --

2         A.   Because there was more stuff that I was

3    still going to bring over as well.

4         Q.   The proof of insurance that you had that

5    night, you showed it to the officers.  Did you

6    have proof of insurance in the car with you?

7         A.   Yes.

8         Q.   And you showed that to the officers?

9         A.   Yes.

10        Q.   And he still wrote a ticket that you

11   didn't have any insurance?

12        A.   He marked it off.  He wrote the ticket

13   up, telling me, "Hey, this is not insurance."

14   And you know, I'm showing this officer, "Hey,

15   look, man.  You can't write a ticket telling me I

16   don't have insurance when I'm showing you the

17   proof of insurance right here."

18        Q.   All right.  Okay.  Then they cited you

19   also for a cracked windshield?

20        A.   It wasn't a crack.  It was a line, I'd

21   say, five, six inches long on the bottom of the

22   windshield from the incident I was involved in,

23   the accident I was involved in a few months prior

24   to that.

25        Q.   How long was the line?

Page 45

1      A.  I'd say no longer than seven, seven

2  inches.

3      Q.  But what would you call this line?  Is

4  it cracked?  Is it a defect in the windshield?  I

5  mean, how would you categorize it?

6      A.  It would be a defect in the windshield.

7  I guess if it had a spider crack, it still would

8  be considered a defect.  I had a ticket for that

9  before.

10      Q.  Who gave you that ticket?

11      A.  This is way back, way back.

12      Q.  Not for that crack, but for another

13  crack on a different car?

14      A.  Yes, only this is --

15      Q.  Was it a similar type crack on the other

16  citation?

17      A.  No, it was a -- you know how a diesel on

18  the freeway throws a little rock and puts a

19  little --

20      Q.  Absolutely.

21      A.  Yeah.

22      Q.  And I'm watching the clock.

23          After they gave you the tickets --

24  during the course of the time they gave you the

25  ticket was when the comments were made about "We

Golden Gate Reporting

Page 46

1    don't want your kind here"?

2        A.  Before the tickets.

3        Q.  Before the tickets.

4            At any time did the officers direct any

5    profanity at you?

6        A.  Yes.

7        Q.  What kind of profanity?

8        A.  Is it common for a police officer to

9    tell somebody, "We don't like your kind of people

10   out here"?

11       Q.  Now, let me just make sure you're clear

12   on what I mean by "profanity."  You understand

13   what "profanity" is, as opposed to --

14       A.  Cuss words.

15       Q.  Cuss words.

16       A.  Yes, there was cuss words exchanged.  I

17   don't recall what cuss words was exchanged, but

18   hey, look, everybody cusses.  It's not like these

19   officers weren't cussing just as well.

20       Q.  What I'm getting at is that you cussed

21   and they cussed.  Both of you were cussing back

22   and forth?

23       A.  Yeah.

24       Q.  Okay.  Were any racial terms used by the

25   officers at you?

Page 47

1       A.  Mr. Allen --

2       Q.  It's just a straightforward question.

3   I'm not -- I understand that there was a verbal

4   exchange taking place, and I understand that you

5   felt that --

6       A.  You don't consider that racial?

7       Q.  What I'm looking for is specific racial

8   words.  Did they call you a nigger?  Did they

9   call you a boons -- call you a coon?

10      A.  Mr. Allen, don't disrespect me like

11  that.  I didn't call you a white European.

12      Q.  No.

13      A.  Don't call me a nigger.

14      Q.  That's not my point.  I'm not calling

15  you that.  What I'm asking you is, in your claim

16  you have a racial bias claim in here.  One way of

17  proving racial bias is that the officers used

18  words like that.  So I need to know --

19      A.  If this officer is telling me, "We don't

20  like you kind of people, not only am I saying

21  this, but other witnesses in this community have

22  heard these officers say this about me."

23      Q.  We're going to talk about that later.

24  We are going to talk about that.

25      A.  To me, yes, that is racial.

Golden Gate Reporting

1       Q.   That's fine.   There's a distinction

2    here, all right?   The distinction is you can make

3    an effort to prove your case of racial animus

4    because they're directing actions towards you and

5    you feel they're directing them towards you

6    because you're black, right, or someone's Asian

7    or someone's Hispanic or someone's American --

8    native American Indian.

9            One way of proving it directly is if

10   they're using language that is commonly

11   understood in the community to be a derogatory

12   term for someone, such as calling -- use a '60s

13   term.   You're too young for this, but a '60s term

14   for a white guy is a "honkey."   All right?

15       A.   I know about that.

16       Q.   Or call them "trailer trash," you know,

17   and things like that that you'll often hear down

18   in the South for white -- poor white.   So that's

19   -- those are terms that can be construed and are

20   clear terms that people understand to be

21   derogatory terms that are racially motivated.   So

22   what I'm asking --

23       A.   Mr. Allen, I know a lot about racism.

24   You don't have to explain to me about honkeys,

25   white trash, like that -- niggers.   I know all

Golden Gate Reporting

Page 49

1   about that.

2       Q.   I'm going to ask this question so --

3       A.   I'm well-experienced in that department.

4       Q.   I'm going to ask this question so we can

5   move on to the next area -- we can take a quick

6   break so the court reporter can move her car --

7   is -- did the officers use any derogatory racial

8   language towards you, specific language that you

9   understand to be racially derogatory?

10      A.   Once again, in my opinion, what this

11  officer told me, that "We do not like you kind of

12  people out here," was a racial statement.

13      Q.   That's clear in the record.  That's

14  clear in your pleadings, and that's clear on the

15  record.  My question is -- because you haven't

16  answered my question -- did they use any other

17  words or any other language?

18      A.   Probably behind my back.

19      Q.   No, did you hear -- but did you hear it?

20      A.   Mr. Allen.

21      Q.   You got to answer the question;

22  otherwise, we're not going to be able to continue

23  the deposition.

24      A.   I gave my answer for that.  To my

25  belief, in my opinion, what this officer stated

Golden Gate Reporting

Page 50

1    to me was a racial statement.  That's my answer

2    to your question.

3         Q.  See, Mr. Davis, the thing we may need to

4    do -- really seriously need to do is continue

5    this deposition and I'll ask Judge LaPorte to

6    provide a courtroom, and we'll go do the

7    deposition down in the courtroom and then she can

8    come in from time to time and rule on your

9    objections, because you're posing an objection,

10   in essence, by not answering the question.

11        A.  Okay.  Let's move on.  No, I did not

12   hear this officer make any --

13        Q.  Racially --

14        A.  -- name-calling as far as the "N" word

15   or any other nicknames they come up with.  No, I

16   did not.

17        Q.  Thank you.

18        A.  Except for that statement that he made

19   and that he suggested that I move.

20        Q.  And that record's clear, and that's part

21   of your evidence.  I'm not objecting to that, and

22   I'm not saying that it isn't part of your case.

23   I need to complete my case.

24        A.  Okay.  Fine.

25        Q.  I need to get the whole circle, not just

3dabddcd-37dd-4dfe-8aee-03cd38734669

## Golden Gate Reporting

1    Q.  Can you think of anything else that

2    occurred that night right then and there before

3    the officers left that we haven't talked about?

4    For example -- let me go back -- did the officers

5    ever lay hands on you that night at that first

6    stop, search you?

7    A.  Well, he told me to sit on the curb,

8    which I refused to sit on the curb.

9    Q.  All right.  Did he make you sit on the

10   curb by putting his hands on you?

11   A.  No.  He told me, "You need to sit on

12   that curb over there."

13   Q.  And you refused?

14   A.  And I told him, "I ain't sitting on no

15   curb.  I didn't do nothing to deserve to sit on

16   no curb."

17   Q.  Did he search you that night?

18   A.  He searched my vehicle.

19   Q.  Did he actually physically go in the

20   vehicle or walk around the vehicle and shine his

21   light into the vehicle?

22   A.  He went and looked in my vehicle.

23   Q.  Did he open the doors?

24   A.  The door was already -- the driver's

25   side door was already open.

## Golden Gate Reporting

Page 54

1        Q.   Did he stick his head in the car?

2        A.   Yes, he did.

3        Q.   Did he move anything around?

4        A.   No, he looked in.  I was standing at the

5    trunk.  All I seen was this officer looking

6    around all inside my vehicle.

7        Q.   Did you ever see him put his hands on

8    any of your items --

9        A.   I couldn't even see him.  I was standing

10   at the rear of the vehicle.

11       Q.   Did Miss Davis ever tell you she saw the

12   officer move any items in your car around?

13       A.   You would have to ask her that.

14       Q.   I think you answered this, but did you

15   ever see him open the glove box or any portion of

16   your car?

17       A.   I couldn't see him.  I just seen --

18   while I'm talking to the officer -- say, me and

19   him talking.  The car's right here.  I look back;

20   I see this officer looking all inside my car

21   through the driver's side.  I don't -- I didn't

22   consent to no search.

23            MR. ALLEN:  Why don't we take a break so

24   you can move your car.

25            (Recess).

Golden Gate Reporting

Page 55

1    BY MR. ALLEN:

2       Q.  After you were cited and released that

3    evening, where did you guys go?

4       A.  To the house.

5       Q.  And sometime the following day another

6    incident occurred?

7       A.  Well, the following morning we went in

8    to speak to Captain Larsen in regards to the

9    incident the previous night.

10             THE REPORTER:  "Captain Larsen"?

11             THE WITNESS:  Larsen.

12             MR. ALLEN:  Captain Larsen, L-a-r-s-e-n.

13   BY MR. ALLEN:

14      Q.  And what did you tell Captain Larsen?

15      A.  I explained to him what happened that

16   night, and he basically told me he would speak

17   with these officers and don't worry about it.

18      Q.  And you were provided the internal

19   affairs investigation information and audio.  Did

20   you review that before your deposition?

21      A.  In regards to which one, the 08-03?

22      Q.  08-03.  When you first saw Dr. --

23   Mr. Larsen, Lieutenant Larsen, Captain Larsen.

24      A.  They never sent me anything.

25      Q.  Okay.  You don't have any information on

Page 56

1    that visit from Captain Larsen?  That's not been

2    provided to you?

3        A.  Dirk Larsen stated that he -- that in

4    the memorandum that Larsen has stated something.

5        Q.  Right.

6        A.  But we never received anything from what

7    Larsen has stated to Celli in his interoffice

8    memorandum, so I have no idea what was stated

9    from Larsen to Miller or Celli or any other

10   officer involved.

11       Q.  And did you tell Captain Larsen

12   essentially the same thing you just told us now

13   in the deposition about the incident of August

14   2nd?

15       A.  Yes.

16       Q.  So after that you returned home, and

17   there was another incident involving a couple

18   officers a little later that day?

19       A.  Later on that night, yes.

20       Q.  About what time was that, approximately?

21       A.  Roughly -- I'm going to guesstimate,

22   say, between 12:00 and 2:00.

23       Q.  Okay.  So it was at nighttime?

24       A.  A.m. -- a.m., p.m.  Well, p.m. and a.m.,

25   combination of the two.

Golden Gate Reporting

1      Q.   Where were you coming from?

2      A.   Flyers gas station, the same gas station

3   previous to the night before.

4      Q.   Okay.  I'm going to -- I need to go

5   back.  The night before, what time was it that

6   you had contact with the police officers at the

7   gas station?

8      A.   Roughly around 1:00.

9      Q.   1:00 in the morning?

10      A.   1:00 -- 1:00 -- between 1:00 and 2:00.

11      Q.   Roughly.

12           So where were you coming from?

13      A.   My home.

14      Q.   Had you been drinking that night?

15      A.   No.  If I had been drinking, would I

16   have gotten a drunk driving or DUI or something?

17      Q.   Just asking the question.

18      A.   Oh, okay.

19      Q.   The night the second incident occurred,

20   where were you coming from?

21      A.   Flyers gas station.

22      Q.   No, where were you coming from before

23   from the gas station?

24      A.   My home.

25      Q.   Okay.  Had you been drinking that

Golden Gate Reporting

Page 58

1    evening?

2        A.    No.

3        Q.    What car were you driving?

4        A.    On which occasion?

5        Q.    The second night, the second incident.

6        A.    I wasn't driving.

7        Q.    What car were you occupying?

8        A.    What was that?  A Chevy Suburban.

9        Q.    Was Page driving that?

10       A.    Yes.

11       Q.    And did you have contact with police

12   officers that evening?

13       A.    Yes.

14       Q.    And what happened?

15       A.    Do you want me to go in detail, or just

16   something brief, fast, real quick?

17       Q.    Well, whatever you feel most comfortable

18   with.

19             Were you pulled over by the police?

20       A.    Well, as we approached a stop sign -- I

21   can't recall what street it is -- we noticed a

22   police officer parked down a dark dirt road.  As

23   soon as we proceeded through the stop sign, he

24   immediately got behind us, pulled us over.  I

25   want to say we turned the corner, I want to say,

Page 59

1    not even a block away from when he first got

2    behind us.  Officer Hobbs approached --

3              THE REPORTER:  Officer who?

4              THE WITNESS:  Hobbs, H-o-b-b-s.

5              -- and Officer Hardisty approached the

6    driver's side, asked Page for her license, proof

7    of insurance and, you know, things of that

8    nature.

9              He immediately looked over at me and

10   asked me what's my problem, do I have an

11   attitude?  And I looked at him and told him, "No,

12   I don't have no problem or no attitude."  He came

13   around, asked me do I have any ID.  I provided

14   him with the ID, the same ID I provided the

15   officer with the previous night before, interim

16   driver's license.

17             He pulled me out of the vehicle, told me

18   how he was detaining me for not having proper

19   photo identification, walked me back to the

20   police car, placed me in the vehicle.  Within a

21   couple seconds, couple minutes, I started having

22   an asthma attack, coughing real loud.  Officer

23   Hobbs opened the door, grabbed me by my right

24   arm, pulled me out the vehicle onto my stomach,

25   placed his knee onto my back, removed the

Golden Gate Reporting

1    handcuffs.  At this time, this is when I noticed

2    Celli standing over me.

3    BY MR. ALLEN:

4        Q.  When Hobbs came up to you and asked you

5    for identification, you gave him the interim

6    driver's license from the night before?

7        A.  Yes, sir.

8        Q.  He said to you that this wasn't --

9        A.  He didn't even look at it.

10       Q.  All right.  And then he asked you to get

11   out of the car, or did he put --

12       A.  At first he asked me why didn't I have

13   the seatbelt on.  And you know, I told him, "Hey,

14   look, you don't reach for stuff when you see the

15   police walking up to the car."  You know, that's

16   a quick way to get, you know --

17       Q.  Were you wearing a seatbelt at the time

18   that the officer -- you were in the car and --

19       A.  No.  I admitted I didn't have a seatbelt

20   on.  No, I didn't have a seatbelt on.

21       Q.  After Hobbs cited you for the seatbelt,

22   is that when he asked you for the identification?

23       A.  Yeah, he asked me for my identification.

24   First he asked me, Hey, what's my problem, what's

25   my -- do I -- "What do you have an attitude for?

Golden Gate Reporting

Page 61

1    What are you laughing for?"  This is before the

2    whole --

3          Q.  Were you laughing?

4          A.  This before the -- this was even before

5    Page could say -- answer him in regard to, "Do

6    you have driver's license, proof of insurance,

7    registration," those -- that thing in nature.  He

8    immediately directed all his attention towards

9    me.

10         Q.  So were you laughing when he walked up

11   to you?  Do you remember?

12         A.  Not that I recall.

13         Q.  Okay.

14         A.  When he asked me do I have a problem and

15   attitude, yes, I did snicker.  It was funny.

16         Q.  And then he asked you why you didn't

17   have a seatbelt on, and you said it was

18   because --

19         A.  I told him, you know, I'm not going to

20   reach for a seatbelt while an officer's, you

21   know, standing right there at the vehicle.

22         Q.  After that occurred, what did he do

23   next?

24         A.  He immediately walked around -- you

25   know, this is before the incident -- or after the

Golden Gate Reporting

Page 62

1    incident with the whole driver's license.  You

2    know, he asked me for --

3         Q.  You had this verbal exchange.  What did

4    he do after the verbal exchange?

5         A.  Now, he's still on Page's side.  He's

6    asking asked me about the seatbelt, for my

7    license -- I mean, a photo identification.  I

8    told this officer -- I said, "Hey, look.  This is

9    the only form of identification I have.  It's a

10   DMV printout of my interim driver's license."

11           He immediately came around to the other

12   side.  "I'm detaining you for not having no --

13   proper identification on you."

14        Q.  So Hobbs and Hardisty both walked up on

15   Page's side?

16        A.  Yes.

17        Q.  Then he walked around the corner --

18        A.  And I would also add that they were in

19   the same vehicle.  They were now two -- they were

20   not in separate squad cars.

21        Q.  Right.

22        A.  And the tow truck driver will confess to

23   that, as well.  He had written out a statement

24   that I will submit before the 28th, as well.

25        Q.  And then Hobbs walked around to your

Golden Gate Reporting

Page 63

1     side.  Did he then order you out of the car?

2          A.  Yes.

3          Q.  Did he put hands on you --

4          A.  He placed me in handcuffs.

5          Q.  I'm going to get there step by step.

6               When you were in the car and he ordered

7     you out, did he put hands on you before you got

8     out of the car?

9          A.  No.

10         Q.  Okay.  When you got out of the car, did

11    he put you in a search position on the car?

12         A.  He immediately grabbed me and placed

13    handcuffs on me.

14         Q.  When you say he grabbed you, how did he

15    grab you?

16         A.  Grabbed me by my arms, you know.  I'm

17    not going to resist no officer and go to jail for

18    something ridiculous.

19         Q.  I understand that.

20              When he you grabbed you, did he grab you

21    in a forceful manner, or did he put you -- grab

22    your one hand and put it behind your back, the

23    other hand, put it behind --

24         A.  Once he told me to turn around, I turned

25    around.  And he placed the handcuffs on me,

1    walked me back to the police car.

2        Q.   You complied with his orders, in other

3    words?

4        A.   Yes, sir.

5        Q.   He didn't grab you so much as he took

6    your hands after you put them behind your back

7    and he put handcuffs on them?

8        A.   Yes.  As you noticed in the photo, how

9    tight those cuffs were -- just cuts into my

10   wrist.

11       Q.   And did he tell you why he was

12   handcuffing you?

13       A.   For not having any identification on me.

14       Q.   Did he tell you you were under arrest?

15       A.   He told me "I'm detaining you -- you are

16   under arrest.  I'm writing you -- I'm putting you

17   in the back of this police car for not having no

18   identification."  He basically didn't even look

19   at the paper that I was trying to give him.  Just

20   basically like, "Okay.  We got him now.  Call the

21   Sergeant Celli."

22           THE REPORTER:  "Call the

23   Sergeant Celli"?

24           THE WITNESS:  Yes.

25   BY MR. ALLEN:

Golden Gate Reporting

1       Q.   Okay.  So he puts you in the back of the

2   radio car.  Did you hear a radio report -- did

3   you hear them asking for Celli?  And just -- if

4   you didn't, it's okay.

5       A.   I was in the back of the police car.  I

6   can't recall.

7       Q.   That's fine.  That's fine.

8            You started to have an asthma attack?

9       A.   Yes.

10      Q.   How long have you had asthma?

11      A.   My whole life.

12      Q.   Did you have an inhaler on you?

13      A.   Page has it in her purse.  She has it in

14   her purse right now as we speak.

15      Q.   Okay.  Did you start yelling for help,

16   or did you hear Page yelling or someone yelling?

17      A.   Well, once Page heard me coughing and

18   telling this police officer I can't breathe, she

19   attempted to get out of the vehicle to find out

20   what was going on back there.  And Officer

21   Hardisty told her to stay in the vehicle, and she

22   stayed up in the front with Page in the front of

23   truck.

24           As Hobbs opened the door, he pulled me

25   out onto my stomach, placed his knee in my back

Golden Gate Reporting

1    and removed the handcuffs.  And I leaned up on my

2    elbows and -- Clearlake is a very dusty town,

3    especially in the summertime, and the dust was

4    just adding to it.

5        Q.  So Page starts to get out.  Hardisty

6    tells her to stay in the car.  Hobbs comes back

7    and takes you out of the backseat.

8        A.  Hobbs is already still back there.  He

9    -- I don't know what he's doing, if he's on the

10   cell phone or whatever he's doing.

11       Q.  He was standing by the back of the car

12   when you started to have your asthma attack?

13       A.  Yes.

14       Q.  You start to have your asthma attack,

15   and you start to yell, "I can't breathe"?

16       A.  Yes.

17       Q.  Something like that.  And then --

18       A.  Well, he heard me coughing.

19       Q.  You're coughing and you're yelling, "I

20   can't breathe"?

21       A.  Yes.

22       Q.  Hobbs goes and pulls you out of the

23   backseat of the car?

24       A.  From my right arm and pulls me down onto

25   the ground.

Golden Gate Reporting

Page 67

1     Q.  Did he say anything to you as he was

2  pulling you out of the car?

3     A.  To be honest with you, Mr. Allen, at

4  that time -- I just blanked out after that.  I

5  can't recall.  You know, the last thing I

6  remember was the tow truck guy pulling up, taking

7  the vehicle.

8     Q.  Okay.  So Hobbs grabs you, pulls you out

9  of the car, pushes you to the ground; right so

10  far?

11     A.  He didn't grab me out of the vehicle and

12  throw me on the ground.  I was seated in the back

13  of the police car, and he grabbed me from my

14  right hand.  He didn't help me out the car.

15     Q.  But you were able to get out?

16     A.  No, I was pulled out of the vehicle --

17     Q.  Right.

18     A.  -- onto the ground.  I was not helped or

19  stood up out the vehicle.  I was pulled from the

20  vehicle.

21     Q.  Pulled from the vehicle.  Does he push

22  you to the ground, or do you fall to the ground

23  as he was pulling you out?

24     A.  He pulled me from the vehicle.

25     Q.  Okay.  You end up on the ground?

Golden Gate Reporting

Page 68

1          A.   On my stomach, yes.

2          Q.   All right.  As best you remember, did

3     you fall to the ground as he pulled you out of

4     the vehicle, or did he push you to the ground as

5     he pulled you out the vehicle?

6          A.   If you're sitting down --

7          Q.   Just your best memory.  It's not --

8     again, I go back.  I'm just trying to get an

9     understanding.  If you --

10          A.   I understand what you're saying, but --

11          Q.   Go ahead.

12          A.   It's a commonsense question.  If you're

13     sitting down and handcuffed and you're pulled out

14     of the vehicle, how can you be pushed?  You have

15     to be pulled.

16          Q.   Okay.  So you end up on the ground?

17          A.   Yeah.

18          Q.   But if he's pulling you out, he could

19     have been pulling you up, or he could have been

20     pulling you down?

21          A.   No, he was not -- he was not pulling me

22     up.

23          Q.   Was he pulling you down or pushing you

24     to the ground?

25          A.   He just pulled me out of the vehicle.

Golden Gate Reporting

1       Q.   Got it.  All right.

2            And when you're on the ground, he put

3    his knee in your back?

4       A.   To remove the handcuffs.

5       Q.   Were you struggling because of your

6    asthma attack?

7       A.   No, I wasn't struggling.

8       Q.   Were you still coughing because of your

9    asthma attack?

10      A.   Yes.

11      Q.   Was -- were you moving around a lot

12   because of your asthma attack, trying to get your

13   breath, as someone, you know, moving and jerking

14   around because you can't breathe?

15      A.   Well, he was handcuffed face-first in

16   some dust.  I couldn't breathe.  And all I felt

17   was his knee in my back.  And next thing you

18   know, the cuffs were removed, and I was on my

19   elbows like this (indicating), coughing.

20      Q.   And I'm not saying or trying to suggest

21   that you were resisting him, but because you were

22   having an asthma attack and you can't breathe,

23   were you struggling because you are in this

24   position with your arms behind your back?

25      A.   I was struggling to breathe.

Golden Gate Reporting

Page 70

1      Q.  Right.  That's what I'm asking you.

2   Were you struggling and moving around, trying to

3   get your breath?

4      A.  I was struggling to breathe.  I wasn't

5   struggling, resisting or --

6      Q.  Exactly.

7      A.  -- fighting this officer or no nature of

8   that.

9      Q.  I got that.

10     A.  Nothing -- no part of that.

11     Q.  I got that.  But I am entitled to have

12  you describe the way your body was moving.  How

13  would you describe the way your body was moving

14  because of the asthma attack?

15     A.  Well, internally my lungs was begging

16  and pulling.

17     Q.  How about your upper body?

18     A.  I was face-first in the dirt.

19     Q.  Well, you weren't lying perfectly still,

20  were you?

21     A.  His knee was in my back.  There was not

22  too much moving I could be doing.

23     Q.  Prior to him putting his knee in your

24  back to take the handcuffs off, was your

25  shoulders moving, was your body moving at all,

3dabddcd-37dd-4dfe-8aee-03cd38734669

Golden Gate Reporting

Page 71

1    trying to get your breath?

2        A.   Not that I can recall.

3        Q.   He puts his knee in his back -- in your

4    back.

5        A.   In my back.

6        Q.   And how long did it take before he put

7    his knee in your back and he got the handcuffs

8    off?

9        A.   As soon as I -- as soon as I was out the

10   vehicle.

11       Q.   He was able to get the cuffs off right

12   away?

13       A.   No, not right away.  I mean, if you see

14   a person choking and gagging, you don't place

15   your knee in their back.  I mean, if that's a

16   life response technique taught to officers, they

17   should re-evaluate their technique.  I mean --

18       Q.   If you -- is it possible to -- you know,

19   like, one, two, three, four, five...

20       A.   Count how long it took the officer to

21   remove the handcuffs?

22       Q.   If not --

23       A.   No, I couldn't.  To be honest with you,

24   no, I couldn't.

25       Q.   That's fine.  That's all I'm asking you,

Page 72

1    best memory.

2         A.   No, I can't.

3         Q.   So the handcuff -- he gets the handcuffs

4    off.  You know, what happens next?

5         A.   I lean up on my elbows.  I'm coughing

6    for, what, five, ten more minutes.  By this time,

7    I don't know who had called an ambulance.  I

8    heard Page and Hardisty arguing -- Officer

9    Hardisty arguing in front of the vehicle.

10        She's telling them, "Hey, what's going

11   on back there?"  Hardisty is telling her, "Don't

12   worry about it.  He's fine.  Don't worry about

13   nothing.  It's all right."

14        This time Sergeant Celli was there.  I

15   don't know how long before that.  Paramedics had

16   arrived.  They placed me in the back of the

17   ambulance.  Sergeant Celli walked up to the back

18   of the ambulance.  At this point I was like,

19   "Naw," you know, "I'm not going to no hospital

20   with this police officer right here," so I

21   refused treatment.

22        I have a nebulizer in my home, so I just

23   told the ambulance, you know, "I'll just go to

24   the house," because it was not even a block away

25   from my house where they pulled me over.  Went to

Golden Gate Reporting

Page 76

1      Q.  Okay.  Now -- but in the time between

2    the asthma attack -- actually, from the moment

3    you were stopped and Hardisty and Hobbs

4    approached you and Page until the time the

5    ambulance arrived, did any of those three

6    officers at any time use any racially derogatory

7    words directed at you or Page?  And this goes

8    back to same stuff we talked about before.

9      A.  Yeah, I know when -- when Hobbs placed

10   the handcuffs on me, he told me, "These are good

11   and rusty."

12     Q.  Okay.  And --

13     A.  But as far as the "N" word and --

14     Q.  Right.

15     A.  -- you know, all of those, you know, no.

16     Q.  Okay.

17     A.  I didn't -- I didn't hear him.

18     Q.  Okay.  And I'll ask Page the same

19   questions.  Now, the ambulance arrived, and in

20   your complaint you said one of reasons that you

21   refused to go in the ambulance, because you were

22   fearing for your life?

23     A.  Yes.

24     Q.  Why were you fearful for your life if

25   you went in the ambulance?

# Golden Gate Reporting

Page 83

1    Page Gearhart-Davis in fear to leave their home

2    during Sergeant Celli's evening shift."

3              Are these the three tickets you're

4    referring to where one was for the dirt bike?

5         A.   Yes, sir.

6         Q.   So when was the dirt bike ticket given,

7    approximately?

8         A.   09-27.

9         Q.   Okay.  On 09-27.  What happened on

10   09-27-06?

11        A.   While riding a dirt bike off-road.

12        Q.   Who?

13        A.   Me and Page.

14        Q.   Okay.  Are you on separate bikes or the

15   same bike?

16        A.   On the same dirt bike, 350 Yamaha.

17        Q.   Who was driving?

18        A.   I was driving.

19        Q.   Okay.

20        A.   On off-road.  Sergeant -- I mean -- not

21   Sergeant -- Officer Hobbs, riding down the street

22   on the side of the dirt trail coming the opposite

23   direction, seen us, made a U-turn, pulled us

24   over, wrote a ticket for unregistered vehicle,

25   driving out of class, littering.  It was a bunch

1    of -- I can't -- it's probably written in there,

2    but the ticket was extremely, ridiculously long.

3    I mean, the ticket -- the judge fined me over

4    $1,200.

5        Q.   Did Celli come to the scene?

6        A.   He was there within minutes.

7        Q.   Okay.  And were you given one ticket

8    with a lot of violations or separate tickets?

9        A.   I was given a ticket, and Page was given

10   a ticket.

11       Q.   And do you remember what your ticket was

12   for?

13       A.   My ticket was for operating a vehicle

14   out of class -- which I explained to them you

15   don't need a driver's license to operate an

16   off-road vehicle, which he later stated, "Hey,

17   you were on this paved road, not on that dirt

18   trail that I just seen you on" -- littering,

19   unregistered dirt bike, no helmet.  And I believe

20   that will put the icing on the cake, I believe.

21       Q.   Littering?

22       A.   Yes.

23       Q.   And no helmet?

24       A.   Yes.

25       Q.   And unregistered dirt bike?

Golden Gate Reporting

Page 85

1       A.  Yes.  I'll be sending that too, the

2   registration, to show that it was registered, in

3   fact.

4       Q.  Okay.

5       A.  Well, he seen the ticket.

6       Q.  Do you know what Page was cited for?

7       A.  No helmet.

8           THE REPORTER:  "No" what?

9           THE WITNESS:  No helmet.

10          And I believe -- I don't want to speak

11  for her ticket.  I'm not absolutely sure.  But I

12  do know one of them was -- I believe was no

13  helmet.  I can't recall the other, if there was

14  another one.

15  BY MR. ALLEN:

16      Q.  Were these tickets dismissed, or were

17  they found -- were you found guilty on those

18  tickets?

19      A.  What's so crazy about that is that was

20  the first ticket the judge heard, and he judged

21  me without hearing the other cases and found me

22  guilty on all of them, but after he heard the

23  other tickets, he seen the pattern and dismissed

24  them like he dismissed the incident from the

25  night at the gas station.

## Golden Gate Reporting

Page 86

1        Q.   So guilty on the motorcycle; dismissed

2    on the other cases?

3        A.   Dismissed on 08-02, suspended on the

4    seatbelt.

5        Q.   What did that mean, by the way?  I

6    didn't understand that.

7        A.   What's that?

8        Q.   "Suspended on the seatbelt"?

9        A.   Suspended fine, as far as paying the

10   fine.  He racked me up good that day in court.

11       Q.   Okay.  So he ended up fining you for the

12   motorcycle, dismissing the 08-02 citations, and

13   then he dismissed 08-03 except for the seatbelt;

14   he just didn't fine you for it?

15       A.   Yes.  No, he -- yeah, he didn't dismiss

16   it.  He just didn't fine me for it.

17       Q.   Was Page fined for the 08-03 ticket or

18   given a fix-it?

19       A.   08-03 ticket.

20       Q.   That was the one you were driving?

21       A.   I believe -- I'm not absolutely sure.  I

22   don't know if it was a fix-it ticket or --

23       Q.   I'll ask her.

24       A.   I have no idea.

25       Q.   I'll ask her.

1        Q.   We're going to do that next.

2        A.   And then the allegedly 911 phone call

3    from my home.

4        Q.   But that was in January; that was later?

5        A.   No, that -- yeah, they said it was in

6    January.

7        Q.   What I'm doing is, I'm just working --

8        A.   Working down it, okay.

9        Q.   -- working through your complaint.

10       A.   Okay.

11       Q.   So your complaint says there was

12   constant harassment.  You've detailed -- you've

13   told us what it was up until now.  Anything else

14   where Celli had contact with you or your wife

15   prior to December 27th?

16       A.   No.

17       Q.   Okay.  On December 27th you and your

18   wife saw Celli and an Officer Labbe parked.

19       A.   Labbe.

20       Q.   Labbe, Labbe.

21       A.   That's what I called him, and he got

22   mad.

23       Q.   And when you went past them, they pulled

24   you over.  They pulled you over, correct?

25       A.   Yes.

Golden Gate Reporting

Page 90

1      Q.  And what car were you driving?  Or what

2   car -- who was driving?

3      A.  Page was driving.

4      Q.  And what car was she driving?

5      A.  A van.

6      Q.  Okay.  Do you remember the kind of van

7   it was?

8      A.  It was a van -- door -- traveling van.

9      Q.  So a panel van?

10     A.  Yeah -- no, not a panel van.  It was

11   like a vacation van.

12     Q.  Did it have windows around it?

13     A.  Yeah, windows and...

14     Q.  Anyone else in the car besides you and

15   Page?

16     A.  On 12-27 I could -- I might -- I could

17   say -- I don't want to -- I could think my kids

18   were in the vehicle, as well.

19     Q.  Do you remember about what time of the

20   day or evening it was or night?

21     A.  It was -- it was on Sergeant Celli's

22   shift, so I was -- it was on his shift.

23     Q.  Was it still daylight or was it

24   nighttime?

25     A.  It was just getting --

1    Q.    Dusk?

2    A.    -- dark, yes.

3    Q.    And did they -- who approached,

4    Sergeant Celli or Officer Labbe?

5    A.    Labbe.

6    Q.    Labbe.

7    A.    Labbe approached Page.  Celli approached

8    my side with his hands on his gun.

9    Q.    Okay.  Labbe give Page a ticket?

10    A.    Yes.

11    Q.    And do you know what the ticket was for?

12    A.    Allegedly obstruction of license plates.

13    Q.    That was the ball hitch?

14    A.    Yes.  I'll send you a picture to show

15    that there's --

16    Q.    That's okay.

17    A.    -- no way possible a ball hitch could

18    obstruct the license plate.

19    Q.    The turn signal?

20    A.    Have you -- you've been out to

21    Clearlake, right?

22    Q.    Yeah.  But I'm just asking, did he give

23    her a ticket for not using the turn signal, not

24    whether she did or she didn't.

25    A.    I think he gave her a warning on that, I

Golden Gate Reporting

Page 92

1    believe.

2        Q.   Okay.  Did you hear -- was there --

3    there was a conversation between Officer Labbe

4    and your wife?

5        A.   Yes, it was right -- I heard everything.

6        Q.   Did he disrespect her in any way during

7    that conversation?

8        A.   He lied.

9        Q.   Beside that?

10        A.   No.  Labbe is a -- to me, to be honest

11   with you, he's a perfectly fine officer.  He was

12   just manipulated on that particular night.  I

13   have no problems -- I'll state it for the record.

14   I have no problem with police officers.  I stay

15   away from them.  I don't give them no problem.  I

16   don't look for no problems from the police.  I do

17   believe police are needed in the community.  But

18   it is bad apples in the bunch.  We all know weeds

19   grow in gardens.

20        Q.   You want to get this done in time to get

21   home, you're going to have to --

22        A.   Oh, my bad.  My bad.  Okay.  I just had

23   to --

24        Q.   I got you.  I know.  There's times you

25   just have to get it off your chest.

1            You said Labbe lied.  What did he lie

2    about?

3        A.  Well, as we approached Lake Shore,

4    Officer Celli and Labbe were parked in the

5    parking lot across the street.  As we approached

6    Lake Shore, as we made a right turn, I seen them.

7    I'm looking dead at these two officers in two

8    different squad cars immediately pull out and

9    were like one or two cars behind us.  And as soon

10    as they had the opportunity to pull us over,

11    Labbe pulled us over.

12        Q.  Go ahead.

13        A.  And I asked him, "What did you pull us

14    over for?"  As soon as I seen Celli, I already

15    knew what time it was.  I was like, "Here we go

16    again."

17        Q.  Okay.  So did you ask him what you were

18    pulled over for?

19        A.  He alleged it was from a ball hitch and

20    not using the turn signal on the street that you

21    don't need --

22        Q.  Okay.

23        A.  Well, to my knowledge, I don't think you

24    need to put on a turn signal.  It would be

25    falsifying the direction to put on the turn

Page 94

1    signal.

2        Q.  Okay.  And he gave her a ticket for

3    expired registration?

4        A.  Expired registration, no proof of

5    insurance -- which we had just purchased that

6    vehicle not even 30 days previous to that, and

7    the license plates stated that the tags

8    expired -- well, you know, I assumed in the end

9    of December, but the tags apparently expired a

10   few days previous to this accident.  And Page had

11   showed him proof of insurance, and he still wrote

12   it on the ticket.  But we had it signed off from

13   the Lake County Sheriff and just ended up paying

14   $10.

15       Q.  For the lack of registration?

16       A.  No, for the --

17       Q.  For the fix-it ticket?

18       A.  He said the light was not working, but

19   it was working.

20       Q.  Okay.

21       A.  So it was a $10 fix-it ticket.

22       Q.  Were you able to produce that -- did

23   Page produce proof of valid registration to

24   Officer Labbe?

25       A.  Like I said, we had just purchased the

Golden Gate Reporting

1    vehicle not even 30 days previous to that.  And I

2    thought -- apparently I was under the wrong

3    assumption that when a tag says like, expires

4    June of '07 --

5         Q.  Mm-hmm.

6         A.  -- at the end of June it expires, so

7    come July, you're --

8         Q.  That's -- that's a specific date.

9         A.  Right.  That was my assumption of...

10        Q.  Tell me what Celli was doing with his

11   hand on the gun when he was next to you.

12        A.  The whole time he was just standing on

13   the passenger side right on my window with his

14   hands on his gun.  And when we first pulled up, I

15   told Page, "Immediately start blowing the horn."

16   The people directly in front came outside and

17   watched the whole thing.

18        Q.  Did you get their names?

19        A.  I have that.  I'll submit all that.

20        Q.  Do you have the names of the people?

21        A.  I don't have their names.  I went by

22   their house, spoke with them.  She's contacting

23   her son, who actually witnessed the whole thing,

24   so...

25        Q.  So the son witnessed it?

1          A.  Matter of fact, Celli told him to go

2    back in the house.

3          Q.  Do you remember the address?

4          A.  I can get the address for you.

5          Q.  And there was a young man that watched

6    this?

7          A.  A young man and a woman.

8          Q.  Can you tell me about how old they were?

9          A.  No, I couldn't.  All I can do is tell

10   you they were European Caucasians.

11         Q.  I mean, were they adults or teenagers?

12         A.  Adults.  Adults.

13         Q.  When Celli was standing there with his

14   hand on his gun, what was he doing?  Did he have

15   it around the grip?  Did he ever take it out?

16   What did you see?

17         A.  No, he didn't take it out.  He just had

18   his hand placed on it, like, "Move, I'll bust a

19   cap on you."

20         Q.  Okay.  Did he ever say anything to you?

21         A.  No, the whole time he didn't say -- oh,

22   as a matter of fact, he ran my name through a

23   dispatch because I heard it through his little

24   walkie-talkie.

25         Q.  He never spoke to you, but you overheard

Page 103

1    as well.  This is the captain of the police

2    department that she said said that.

3        Q.  All right.  How many times did Celli

4    drive by your house during -- between August of

5    '06 and December of '06?

6        A.  Oh, my gracious.  I would see these guys

7    ride up and down Second Street so many different

8    times.  It -- it would get to the point where,

9    you know, they would drive by slow, looking at

10   the house and, you know, different -- different

11   -- different times.

12       Q.  More than once a day?

13       A.  I would say on his shift -- not during

14   -- I never had any problems during the day shift.

15   Never had not one ticket, one incident during the

16   day-shift officers.

17       Q.  Okay.  How many times a shift -- how

18   many times a day on the Celli shift would you say

19   you saw officers --

20       A.  I can't actually pinpoint the number

21   down, but I can say more --

22       Q.  More than five?  Less than five?

23       A.  Yes.  More than ten.  I can say more

24   than ten times.

25       Q.  Okay.  More than ten times a day.  All

Golden Gate Reporting

1    right.

2        A.  No, no.  I'm not -- I'm not saying more

3    than ten times a day, now.

4        Q.  Well --

5        A.  Hold on.

6            THE REPORTER:  We're really talking over

7    each other.

8            THE WITNESS:  Oh, you're good.

9    BY MR. ALLEN:

10       Q.  Okay.  The question I asked --

11       A.  No, I'm not saying more than ten times.

12       Q.  More than ten or less than ten?

13       A.  He -- I noticed him drive past my home

14   more than ten different occasions during that

15   time, that whole -- not during one day, but the

16   whole --

17       Q.  Ten times in the --

18       A.  More than --

19       Q.  -- months between August and --

20       A.  Even at ten -- I'll just say numerous to

21   keep it open in digits.

22       Q.  Well, "numerous" could mean a thousand.

23       A.  Exactly.  Or it could mean three.

24       Q.  Right.  So --

25       A.  That's why I'm saying --

Golden Gate Reporting

1        Q.  You really don't know how many times

2    that he drove by?

3        A.  Well, I could say numerous amounts of

4    times.  I can't just say "ten times" and just put

5    a number on there.  If you're going to quote me,

6    quote my exact words.  Not "ten"; "numerous."

7        Q.  See, again, I'll go back to that

8    original admonition I gave you.  I'm not asking

9    you to guess or speculate, but I am entitled to

10   your best estimate.  And one way of developing a

11   measurement is to try and come up with kind of a

12   parameter.

13            So I'll give you a parameter.  There's a

14   given shift.  And in a given shift -- is it

15   possible to say on a given shift you saw them

16   more than once a day on a given shift drive by

17   your house?  Is it possible?  If it's not

18   possible, it's not possible.

19       A.  Before you -- okay.  I understand what

20   you're saying, that you have to have a number to

21   put in there.

22       Q.  Not "a number."

23       A.  Okay.

24       Q.  But I'm entitled to an estimate if we

25   can agree on a parameter.  So I'll give you for

Golden Gate Reporting

Page 106

1    example --

2         A.   Okay.  We can say --

3         Q.   Is it possible to say by a day or

4    possible to say by a week or possible to say by a

5    month?  So for example -- just for example, I

6    think that it would be fair to say that "maybe

7    two or three times a week" or "four or five times

8    a month" or "I -- I can't say at all.  I just

9    remember seeing him go by my house, but I

10   couldn't tell you how many times either by the

11   week, by the month or in that six months."

12        A.   And "numerous" is not --

13        Q.   "Numerous is --

14        A.   -- recognizable in this situation.

15        Q.   -- a very speculative -- it's a

16   speculative number.  Even you said it.  It could

17   be a thousand; it could be three times.  Do we

18   know what that is?

19        A.   Okay.  Well, we can say --

20        Q.   I'm just trying to think is there

21   another way you could come up with it?

22        A.   We can just -- because I don't want to

23   quote something that's not true, and I don't want

24   no words --

25        Q.   Say "approximate."

1          A.   I don't want no words --

2          Q.   Say "approximate."

3          A.   Approximately numerous different times,

4    then.

5          Q.   Okay.

6          A.   Is that all right with you?

7          Q.   That's your answer.  I can't make you

8    say something --

9          A.   I mean, I don't want to -- I mean, I'm

10   trying to cooperate with you.

11         Q.   Wait.  I can't make you say what you

12   don't want to say.

13         A.   It's not that I don't want to say.  It's

14   because I don't know how many times.  All I know

15   is --

16         Q.   All right.  That's an answer.

17         A.   -- it's numerous different times.  It's

18   stated right there.

19         Q.   That's an answer.

20              There was an occasion when he went by

21   your house claiming that he had received a 911

22   call, and you took a videotape of that?

23         A.   Yes.

24         Q.   And do you still have the videotape of

25   that?

Golden Gate Reporting

Page 108

1       A.  Yes, I have the video.

2       Q.  Do you remember approximately when that

3   occurred?

4       A.  What date it was?  I'll submit that by

5   May -- by the 28th.  The video will be submitted

6   by the 28th.

7       Q.  Does the video have audio on it?

8       A.  Yes.

9       Q.  Did anyone make a 911 call from your

10  house that day?

11      A.  No.

12      Q.  Celli responded.  Did any other officers

13  respond?

14      A.  It was another officer I never seen

15  before.

16      Q.  Do you know if he was --

17      A.  His name is somewhere in something you

18  guys had sent.  I can't recall his name.

19      Q.  Did Celli use any profanity or racial

20  slurs that day toward you?

21      A.  No.

22      Q.  Okay.  Did he make any threats or

23  threatening gestures towards you that day?

24      A.  He threatened me by coming to my home,

25  Mr. Allen.

Golden Gate Reporting

Page 109

1      Q.   I understand that.

2      A.   He threatened me by coming by my home.

3      Q.   Mr. Davis, you have a burden of proof,

4    and I have a burden to rebut that.

5      A.   That's threatening me.

6      Q.   That's fine.

7      A.   You're coming to my home wearing a

8    badge.

9      Q.   Mr. Davis, I'm accepting that as your

10   transcript testimony.

11     A.   Okay.

12     Q.   But I'm entitled to follow up with

13   questions about it.

14     A.   Okay.

15     Q.   All right.  You can offer your answer.

16   That doesn't mean I'm not allowed to ask a

17   follow-up question, so I'm asking a follow-up

18   question.

19     A.   Okay.

20     Q.   Other than coming to your house, did he

21   do anything else?  You have, for example,

22   described how he put his hand on his gun in one

23   instance.  Did he do anything like that when he

24   came to your house that night?

25     A.   Okay.  First, I've said he came to my

Golden Gate Reporting

Page 110

1    home.  Second, I'm saying that he can use his

2    badge to do that.

3         Q.  Sure.

4         A.  Is that all right?  Is that a good

5    statement?

6         Q.  Absolutely.  And I'm asking you is there

7    anything else he did that you can remember?

8         A.  He used the police department to do

9    something that was not -- why would I call the

10   police --

11        Q.  I have no idea.

12        A.  -- on his shift?

13        Q.  I have no idea.

14        A.  I had his shift completely logged down

15   to a "T."

16        Q.  What I want to know now -- so there was

17   nothing else that you can describe beside the

18   fact he used his police car, his badge, and he

19   showed up on your property?  He didn't gesture

20   with his gun or his hand or anything, like he

21   didn't make any gestures?

22        A.  Well, once he seen me pull out the video

23   camera, he took off and ran behind some bushes.

24        Q.  Okay.  And that's all on the video?

25        A.  Everything.

Golden Gate Reporting

Page 111

1      Q.  All right.  We're going to ask for that
2   video.  We thought that was --
3      A.  Well, you don't have to ask for it
4   because I'm going to submit it.
5      Q.  Sounds good.
6      A.  Now, the video, I had the lens on it,
7   but you can hear the whole complete conversation.
8      Q.  All right.  So --
9      A.  You hear -- you hear Sergeant Celli --
10  well, I'll just send it instead of stating,
11  because I don't want to say something and then
12  you turn around and say, "That's not what he
13  said."  I'll send it by the 28th.
14     Q.  The video will speak for itself.
15     A.  Exactly.
16     Q.  All right.  Now, your next paragraph
17  goes on to say that you and your wife organized
18  monthly meetings with the community of Clearlake.
19         How many meetings did you have?
20     A.  Once a month for -- I want to say from
21  September -- well, the Department of Justice
22  came --
23     Q.  Well, let's just start with the meetings
24  before we get to the department.  I'm going to
25  ask you.  Believe me, I think I've shown you I do

Golden Gate Reporting

Page 112

1    ask all those questions that you want to raise,

2    right?

3        A.  Yeah.

4        Q.  Okay.  So why don't we start with this

5    because it stays more in a continuous manner.

6        A.  Okay.  I'm going to say --

7        Q.  You held meetings once a month --

8        A.  From September, October, November,

9    December, and the last meeting I had was in

10   January.

11       Q.  '07?

12       A.  Yes.

13       Q.  During these meetings, you said other

14   people came and complained about the police

15   department?

16       A.  Oh, numerous, numerous.

17       Q.  Do you have the names of any of the

18   people who attended and complained about the

19   police department?

20       A.  I sent you all that information.

21       Q.  Okay.  I'll double-check it, and I'll

22   follow up.

23       A.  Okay.

24       Q.  Any of the people you spoke to have

25   specific incidents involving Officer Celli?

Page 113

1         A.  Well, the last paper I sent you was

2    involved with a citizen by the name of Anthony

3    Williams.  I sent you the newspaper article in

4    regards to that.  Did you receive that?

5         Q.  I may have.  I can't remember.

6         A.  It was in regards to Officer Miller

7    ripping off his colostomy bag off of a gentleman.

8    And that was one of problems we had as far as the

9    things you guys is saying.  As far as the

10   officers -- complaints filed against officers,

11   that was one of them that was withheld on

12   Miller's alleging that there was no other

13   complaints filed against him.  It was in the

14   newspaper.

15        Q.  Okay.  You say the Department of Justice

16   became involved.  When did they become involved?

17        A.  I want to say in November.

18        Q.  Of '06?

19        A.  Yes.

20        Q.  And did you speak with the Department of

21   Justice?

22        A.  A gentleman by the name of Booker Neal

23   out of San Francisco.

24        Q.  FBI or special agent for the Department

25   of Justice?

1    A.  I have no idea, but I just know he was

2    up there recently previous a few years ago for

3    somebody burning a cross in some lady's yard.  I

4    don't know what field he's in.

5    Q.  And did you speak with any other agents

6    in the Department of Justice?

7    A.  I spoke with a gentleman by the name of

8    Brian Cook.  I think he's in San Rafael FBI

9    headquarters.

10    Q.  Okay.  And do you know the outcome of

11    their investigation?

12    A.  No, I do not.  FBI agents, they don't

13    disclose that type of information.

14    Q.  Have you ever been -- have you ever been

15    called to testify in a hearing regarding the

16    Clearlake Police Department besides this

17    deposition hearing?

18    A.  I've only been out there prior to this

19    about a -- say, a year maybe, so no.

20    Q.  Do you know if your wife spoke with

21    these agents, as well?

22    A.  She spoke with Booker Neal and

23    Brian Cook, as well.

24    Q.  And do you know if anybody else spoke

25    with them?  Do you know if there was anybody else

Golden Gate Reporting

Page 115

1    that spoke with them?

2        A.   Everybody -- everybody at the meeting

3    spoke with Booker Neal, Ella Baker Department.

4    There was written statements made through the

5    Ella Baker Department.

6        Q.   What's the Ella Baker Department?

7        A.   It's in Oakland.  It's for -- it's like

8    police watch, a foundation organized for police

9    misconduct.

10        And also there was complaints written up

11    on January 30th when Ella Baker and the

12    Department of Justice came to my home to

13    interview these people in regards to complaints

14    filed against these officers.

15        Q.   When was this?

16        A.   January 30th.

17        Q.   Of what year?

18        A.   '07.

19        Q.   So is that when you met Agent Neal and

20    Agent Booker -- I'm sorry -- Agent Neal and

21    Agent Cook, was at that meeting of January 30th?

22        A.   No.  Brian Cook never came to the

23    meeting.  I spoke with him over the telephone.

24        Q.   Okay.  And did --

25        A.   Booker Neal, he's the gentleman that

Page 116

1    came to my residence.

2        Q.   And that was on January 30th, 2007?

3        A.   Yes.  Yes.

4        Q.   And since then have you spoken with any

5    agents from the Department of Justice?

6        A.   No.

7        Q.   Have you had any more meetings regarding

8    the Clearlake Police Department?

9        A.   They shut me down on all of that.

10       Q.   Okay.  Who shut you down?

11       A.   The police, defamation of character.

12   They're going around telling people that we go

13   from town to town bribing people and suing police

14   departments.

15       Q.   Okay.  Have you ever sued a police

16   department before?

17       A.   No.

18       Q.   Have you ever filed any police -- any

19   suits of any kind prior to this one?

20       A.   No.

21       Q.   And were you present when you heard a

22   police officer say to you or anyone that you went

23   from town to town filing police lawsuits?

24       A.   A lady by the name of Linda Conaway who

25   used to work in the police department.

Golden Gate Reporting

1      Q.   What's her name again?

2      A.   Linda Conaway.

3      Q.   Linda?

4      A.   Conaway.

5      Q.   L-i-n-d-a?

6      A.   L-i-n-d-a, C-o-n-a-w-a-y.

7      Q.   Linda C-o-n- --

8      A.   -o-n-a-w-a-y.

9      Q.   Conaway.

10     A.   She was a employee for the -- I don't

11   know if the police department of the City of

12   Clearlake, whatever way.  Her and a couple other

13   employees, they went to the FBI in regards to

14   stuff being written off, numerous different

15   things.  I have her diary.  She turned a diary

16   over to me in regards to her -- Tim Fassler, who

17   was another officer who worked for the

18   Clearlake --

19          THE REPORTER:  Tim who?

20          THE WITNESS:  Tim Fassler, spelled

21   F-a-s-s-l-e-r.  He's no longer employed with the

22   Clearlake Police Department.

23          And a couple other people have went to

24   the FBI in regards to --

25   BY MR. ALLEN:

Golden Gate Reporting

Page 118

1      Q.   He went to the FBI also?

2      A.   Yes.

3      Q.   Okay.  Have you spoke with Tim Fassler?

4      A.   I spoke with Tim Fassler a few different

5   times, and then we just stopped speaking.  For

6   what reason, I don't know.

7      Q.   And what did Fassler tell you about the

8   Clearlake Police Department?

9      A.   He just told me, you know, the things

10  that go on there that -- like as far as their

11  procedures as far as complaints being filed

12  against officers.  There is no procedure.  They

13  just basically do what they want to do.

14           He was later charged for a crime for

15  giving alcohol to a minor or something like that.

16  He ended up moving out to the -- I don't know

17  where he is now.  I think out here somewhere.

18  But him and a few other employees.

19           Linda Conaway, she was one of them who

20  attended the meeting.

21      Q.   What did Conaway tell you about the

22  police department?

23      A.   Well, she had told me -- she had stated

24  to me that Fassler -- she had a neighbor that she

25  couldn't stand, and Fassler and her had conjured

3dabddcd-37dd-4dfe-8aee-03cd38734669

Golden Gate Reporting

1    up a fake 911 call to come into this person's

2    house.  And she knew, I guess, he had drugs or

3    something in his home and arrested him under a

4    fake 911 call.

5         But her whole reason for going to the

6    FBI, from what she told me, is that the

7    government grants and the State grants that was

8    given to the County or the City of Clearlake was

9    basically being trimmed where they were pocketing

10   the money.  And they went to the FBI in regards

11   to her writing off the different accounts and

12   whatnot, so to speak.

13        Q.  So just so I'm --

14        A.  Just to let you know, that pertains to

15   nothing of my complaint.  That's something that

16   she brought to my attention and to the Department

17   of Justice attention, that she went to the FBI,

18   as well.

19        Q.  Well, what I wanted to get at --

20        A.  The mayor even went to the FBI, as well.

21        Q.  But you believe -- you think that

22   Fassler was -- was Fassler terminated, do you

23   know?  I mean, do you --

24        A.  Fassler -- Fassler, he had a case

25   brought against him for, I think, giving alcohol

Golden Gate Reporting

1    to a minor or something like that.

2        Q.  Do you know if -- do you know, was

3    Conaway terminated?

4        A.  I have no idea what her status or reason

5    for leaving:  retirement, fired, kicked out; I

6    .have no idea.

7        Q.  But both of them have told you there's

8    problems with the police department?

9        A.  Yes.- Not only her, numerous people in

10   the community.  Officer Brady, who is a current

11   officer there, came to my home.

12       Q.  That's what I want to talk to you now.

13   Who's -- Officer who came to your home?

14       A.  Officer Brady, spelled B-r-a-d-y.

15       Q.  And he came to your home and told you

16   what?

17       A.  And he came to my house -- well, I spoke

18   with Officer Brady numerous different times, but

19   in this particular time, he came to my home and,

20   you know, explained to me, "Hey, look," you know,

21   "Celli" -- he explained to me about one incident

22   in particular involving Celli involved in a

23   public bar drinking and he pulled a gun on

24   another individual that was in the bar.  And also

25   told me that Hobbs and Celli have numerous

Golden Gate Reporting

Page 121

1  complaints against them.

2      Q.  And what else has Brady told you about

3  the police department?

4      A.  That's about it.

5      Q.  All right.

6      A.  I'm going to tell the truth, what he --

7  exactly what he told me, so...

8      Q.  All right.  And why was he at your home

9  that day?

10     A.  Well, that was just one of the

11  particular times.  He -- he lives, like, I want

12  to say, maybe seven, eight -- don't quote me for

13  that -- seven, eight, nine, ten blocks away from

14  me, and he bikes rides through the neighborhood.

15  I happened to be outside playing with my kids.

16  And he seen me, stopped with me, go, "Hey, what's

17  going on?"  Okay.  You know, just generally

18  speaking.

19     Q.  What other people have come to you?  You

20  mentioned the mayor.  Has the mayor spoken with

21  you about --

22     A.  No.  She -- I never spoke to the mayor.

23  I was going off the regard --

24     Q.  Correct.

25     A.  -- a statement that she made.

Page 126

1     A.  Yes, they completely stopped once they

2   found out that this lawsuit was in motion.

3     Q.  All right.  Did you ever speak with the

4   chief of police regarding these incidents, you

5   personally?

6     A.  I spoke with the captain, Ron Larsen --

7     Q.  All right.

8     A.  The same individual who later turned

9   around and told Labbe that "we don't need those

10  kind of people in our town."  What kind of people

11  am I?

12    Q.  Okay.  You have -- there's been no --

13  the Clearlake Police Department has had no --

14    A.  I never spoke --

15    Q.  -- has had no further contact with you

16  or Page Davis since January 30th, 2007?

17    A.  No.

18    Q.  Okay.

19    A.  Except -- hold on.  When did you say?

20  After January of 0007?

21    Q.  Well, you said that --

22    A.  Except for that time they came by the

23  house.

24    Q.  -- you made -- the DOJ agent came to

25  your house -- Neal Booker {sic} came to your

## Golden Gate Reporting

1    house --

2         A.  January 30th.

3         Q.  -- around January 30th, 2007?

4         A.  Yes.  Yes.

5         Q.  Has Clearlake Police Department stopped

6    -- did they stop all contact with you after that?

7         A.  Well --

8         Q.  Assuming -- we don't know when the 911

9    call was.  Other than the 911, possibly?

10        A.  No, I haven't had any more problems with

11   them, but I avoid being out -- Sergeant Celli, I

12   believe, is on day shift now.  I try to be pretty

13   familiar on which shifts he's on.

14        Q.  Okay.  And how about Page?  Has she had

15   any problems with the Clearlake Police Department

16   since the meeting with Agent Booker and the DOJ?

17        A.  Has she -- excuse me?

18        Q.  Since the meeting in January with

19   Agent Booker in January 2007, has your wife had

20   any contacts with the Clearlake Police

21   Department?

22        A.  No.

23        Q.  All right.  And I understand this

24   complaint was taken from a book, but I have to

25   ask you this question because we have talked