1  DAVID DAVIS and PAGE GEARHART-DAVIS
   PRO SE
2  PO BOX 3225
   CLEARLAKE, CA 94522
3  (707)995-0749

**FILED**



.'I'II  2 3 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

5                    IN THE UNITED STATES DISTRICT COURT

6                     THE NORTHERN DISTRICT OF CALIFORNIA

7                          SAN FRANCISCO DIVISION

8

9  DAVID DAVIS and PAGE GEARHART-DAVIS,    Case No.: **C 07-03365 EDL**

10          Plaintiff(s),              **PLAINTIFF(s) DAVID DAVIS and PAGE**
                                       **GEARHART-DAVIS OPPOSITION TO**
11     vs.                            **DEFENDANT(s) MOTION FOR SUMMARY**
                                       **JUDGEMNT, OR IN ALTERNATIVE, PARTIAL**
12  CLEARLAKE POLICE DEPARTMENT,         **SUMMARY JUDGMENT**

13          Defendant(s)              Date: August 12,2008
                                      Time: 9:00 a.m.
14                                    Courtroom: E, 15th Floor
                                      Judge: Elizabeth D. Laporte
15

16  **STATEMENT of PURPOSE**

17       The Plaintiff(s) David Davis and Page Gearhart-Davis hereby moves the

18  Court to deny Defendant(s) summary judgment on the grounds that Plaintiff(s)

19  not only have genuine issues of material facts but also have supporting

20  evidence to reflect it's claim.  Defendant(s) have neither evidence nor

21  similar case laws to reflect their defense.  Plaintiff(s) jointly ask the

22  Court to continue this case with scheduled trial date.

23

24

25

                                    - 1

1

**TABLE OF CONTENTS**

2

Page(s)

3   I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . .    1

4

5   II.   STATEMENT OF RELEVANT FACTS . . . . . . . . . . . . . . . .    5

6

7   III. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . .    12

8

9         A.   Violation of 4th & 14th Amendment . . . . . . . . . . . . . . .    13

10        B.   Racial Profiling . . . . . . . . . . . . . . . . . . . . .    15

11        C.   Violation of 42 U.S.C. §§ 241 & 1985 . . . . . . . . . . .    15

12        D.   Violation of 42 U.S.C §§ 242 & 1983 . . . . . . . . . . .    15

13        E.   Faliure to Supervise Officer's Adequately . . . . . . . .    15

14

15   IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . .    17

16

17

18

19

20

21

22

23

24

25

1

## TABLE OF AUTHORITIES

2  Cases                                                    Page(s)

3  Atwater v. City of Largo 532 U.S. 318 . . . . . . . . . . . . . .    13

4  Bygum v. City of Clearlake  . . . . . . . . . . . . . . . . . . .    16

5  Griffin v. City of Clearlake C-002504 . . . . . . . . . . . . . .    16

6  Hernandez v. City of Clearlake C-99-3185  . . . . . . . . . . .    16

7  Hupp v. City Walnut Creak 389 F.Supp2d 1229 . . . . . . . . . .    16

8  Simmons v. City of Clearlake C-98-1251  . . . . . . . . . . . .    16

9  Terry v. Ohio 392 U.S. 1   . . . . . . . . . . . . . . . . . . .    12

10  Vespa v. City of Clearlake C-97-3756  . . . . . . . . . . . . .    16

11  Constitutional Provisions                                   Page(s)

12  U.S. Constitutional, Amended IV   . . . . . . . . . . . . . . . 6,8,11,12,14

13  U.S. Constitutional, Amended X1V  . . . . . . . . . . . . . . . 6,8,11,12,14

14  Federal Statutes                                            Page(S)

15  18 U.S.C. § 241  . . . . . . . . . . . . . . . . . . . . . . .    16

16  18 U.S.C. § 242  . . . . . . . . . . . . . . . . . . . . . . .    16

17  42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . .    16

18  42 U.S.C. § 1985 . . . . . . . . . . . . . . . . . . . . . . .    16

19  State Statutes

20  California Vehicle Code § 27315  . . . . . . . . . . . . . . .    13

21  City Policies                                               Page(s)

22  Clearlake Police Department Policy 1020  . . . . . . . . . . .    9,10

23

24

25

## I.    INTRODUCTION

Plaintiff(s) brought this lawsuit against the City and it's employees only after the continued harassment suffered at the hands of the Clearlake Police Department.

Neither Plaintiff(s) nor Defendant(s) deny the confrontation that took place on August 2, 2006.  The Plaintiff(s) were the ones that took the initiative to go and speak with the Clearlake Police Officers to try and resolve the problem before it got out of hand.  Plaintiff(s) were not only denied the opportunity to speak with these officers but obviously these officers took this matter personally in which they later manipulated their authority to target and retaliate against Plaintiff(s).  Defendant(s) Inner Office Memos clearly show their true intentions.

Plaintiff(s) intentions on trying to resolve the matter with Defendant(s) was only turned into Plaintiff(s) "making a Beef" against the Clearlake Police Department in which Plaintiff(s) were labeled as Anti-Law Enforcement and a Threat to the Community only because they exercised their right as citizens.

Defendant(s) issued Plaintiff(s) numerous moving infractions without verifying the authenticity of the violation.  Clearlake Police officers performed no dispatch record check on Plaintiff(s) except for one incident. On August 3, 2006 Plaintiff(s) vehicle was towed alleging Page Gearhart-Davis had no drivers license when in fact her California Drivers License was valid. Clearlake Police Officers were pulling Defendant(s) over alleging they had performed a moving violation when in fact pictures clearly show no infraction was possible.

1     Clearlake Police officer, Sgt. Celli, which is the officer that

2   continues to harass and have officers only on his shift continue his tyrant

3   against Plaintiff(s).  Defendant(s) came to Plaintiff(s) home on January 17,

4   2007 alleging a "911 call hang-up" was made from the residence.

5   Defendant(s) have fabricated a "911 Ali Report" when the truth of the matter

6   is a Federal Subpoena issued to Lake County Dispatch clearly shows that there

7   was no 911 call made from Plaintiff(s) home on the date in question.

8     Clearlake Police Officer's records clearly reflect similar misconduct,

9   which has been allowed to continue even though Defendant(s) are aware of

10   these officers behavior.

11     This case is not based on opinion; it is based on facts and evidence

12   that supports Plaintiff(s) claim.  Defendant(s) now seek refuge behind

13   immunity, laws that have been written to protect officers whom don't

14   intentionally break the law, and their counsel in which Defendant(s) counsel

15   is relying on cases that have no similarity or bearing on this case.

16   **II.   STATEMENT OF RELEVANT FACTS**

17     On August 2, 2006 Plaintiff(s) were approached while pumping gas into

18   their 1967 Mercury Cougar by two officers by the names of Sgt. Celli and

19   Officer Miller. (Ex. 1 at 1:26,2:1-2 and Ex. 2 at 2:4)  There is no way you

20   can see a license plate on a Mercury Cougar while pumping gas because you

21   have to turn down the license plate to access where the gas is pumped. (Ex. 3

22   at 28:11-15)  After Defendant(s) counsel realized you would not be able to

23   view a license plate on a Mercury Cougar while pumping gas they altered the

24   reason officers approached Plaintiff(s) from approaching because of no

25   visible plates to the cracked windshield. (Ex. 4 and Ex. 5 and Ex. 6 and Ex.

- 5

1  7 at 9:21-23)

2       In Officer Todd Miller's Declaration in which he declares to having

3  personal knowledge of the facts and would testify competently if called upon

4  states on August 2, 2006 Plaintiff David Davis was pumping gas into a Mercury

5  Cougar. (Ex. 6 at 1:26-28)  But on Officer Todd Miller's interview from

6  IA#08-03-06/90/107/132/145 Officer Miller states David Davis was trying to

7  fill up a five-gallon gas can. (Ex. 8) Officer Miller was questioned by the

8  judge several times in court on December 14, 2006 whether or not he had

9  stopped Plaintiff David Davis while driving or approached him regarding the

10  traffic ticket issued on August 2, 2006, in which Officer Miller could not

11  give a straight answer. (Ex. 9)  Plaintiff(s) later sent the audiotape taken

12  in court to an audio expert who analyzed the tape and found the tape to

13  having been altered and punched. (Ex.10)

14       Plaintiff David Davis was asked if the vehicle was his, if he had

15  drivers license, registration, and proof of insurance.  (Ex. 1 at 2:2-3 and

16  Ex. 2 - statement neither admitted nor denied)  **F.R.C.P. 8(d)** states you are

17  considered to have admitted every statement that you do not specifically

18  deny, except for the amount of damages.

19       Sgt. Celli entered and searched Plaintiff(s) vehicle without

20  Plaintiff(s) consent and without Plaintiff(s) giving him any probable cause

21  for him to do so or before violating Plaintiff(s) **4th & 14th Amendment Right.**

22  (Ex. 1 at 2:8 and Ex. 3 at 53:17-25, 54:1-6)

23       Officer Miller told Plaintiff(s) "we don't like your kind of people" and

24  that Plaintiff(s) "need to move". (Ex. 1 and Ex. 5 and Ex. 6 and Ex. 11)

25       Plaintiff(s) went in and spoke with Capt. Larson later on that morning

1 | regarding incident at the gas station on August 2, 2006 to try and resolve
2 | the problem. (Ex.1 at 2:11-14 and Ex. 2 at 2:22-23 and Ex. 5)   Defendant(s)
3 | took Plaintiff(s) forthcoming of trying to resolve the problem as "making a
4 | beef" against them. (Ex. 11)

5 | On August 3, 2006 Plaintiff(s) were stopped only a few blocks from their
6 | home alleging they had run a stop sign, made a turn without signaling, and
7 | having an obstructed license plate. (Ex. 1 at 2:17-20 and Ex. 2 at 3:2-3)
8 | When Officer Hobbs was questioned in court on December 4, 2006 what was
9 | blocking the license plate Officer Hobbs could not recall what it was. (Ex. 1
10 | at 2:20-21 and Ex. 9)   Officer Hobbs also admitted to being briefed about an
11 | incident with an individual from the night before. (Ex. 5)

12 | Officer Hobbs claims to have run Plaintiff(s) license before pulling
13 | their vehicle over but the time shown on the dispatch report clearly reflects
14 | that the Plaintiff(s) license was run after he had pulled them over. (Ex. 12
15 | and Ex. 13)

16 | Officer Hobbs and Officer Hardesty approached the driver's side and
17 | Officer Hobbs immediately started asking Plaintiff David Davis if he had an
18 | attitude and why he did not have his seat belt on. (Ex. 1 at 2:21-24)
19 | Officer Hobbs asked David Davis for identification, which David Davis
20 | provided him with his California Interim Drivers License as DMV clearly
21 | states to be used as your temporary identification until your permanent
22 | arrives in the mail in four to six weeks. (Ex. 1 at 2:24-26 and Ex. 7 at
23 | 4:13)

24 | The same way Defendant(s) counsel is trying to change the reason for the
25 | Plaintiff(s) having been approached at the gas station on 8-2-06, Officer

1   Hobbs also changes his story after he realized David Davis gave him his CA

2   issued Temporary Drivers License (Ex. 12 and Ex. 15)

3       Defendant(s) are clearly trying to cover the use of false detainment,

4   excessive force and illegal search and seizure on Plaintiff(s) in which they

5   violated Plaintiff(s) **4th & 14th Amendments**.  Officer Hobbs removed Plaintiff

6   David Davis from the vehicle and purposely placed handcuffs on David Davis to

7   the point where they cut into his wrists. (Ex. 16)  Sgt. Celli requested

8   Officer Hobbs to call him regarding the subject, David Davis, which he had in

9   custody to remind him Plaintiff David Davis was anti-law enforcement. (Ex.

10  17)

11      Plaintiff David Davis started having an asthma attack while in the back

12  of the patrol vehicle.  Officer Hobbs then pulled David Davis from the

13  vehicle, face down into the dirt, and placed his knee into his back. (Ex. 1

14  at 3:5-10 and Ex. 7 at 4:22-24)  Sgt Celli states that Plaintiff David Davis'

15  asthma was "obviously faked" even though Sgt. Celli is neither qualified nor

16  knowledgeable to make a medical physicians diagnosis. (Ex. 17)  Plaintiff

17  David Davis is a documented asthma patient and has been diagnosed since a

18  child.

19      Plaintiff(s) vehicle was illegally towed alleging Plaintiff Page

20  Gearhart-Davis did not have a valid driver's license when CA DMV clearly

21  shows she did. (Ex. 18 and Ex. 19)  Plaintiff Page Gearhart-Davis gave

22  Officer Hobbs her Florida ID Card as well as her California Driver's License

23  number in which Officer Hobbs claims to have run a record dispatch on both.

24  (Ex. 19 and Ex. 20 and Ex. 12)

25      On August 3, 2008 Plaintiff(s) filed a formal complaint against

1   Defendant(s). (Ex. 5)  Plaintiff(s) complaint was never fully investigated
2   because Page Gearhart-Davis was never contacted and questioned even though
3   she was listed as a witness in the claim. *Clearlake Police Department's*
4   *Policy 1020* clearly states the supervisor should make every reasonable effort
5   to speak with witness.  The investigation done on this complaint could not be
6   considered as bias because it was conducted by Capt. Ronald Larsen, whom was
7   overheard making racial statements by a Clearlake resident about Plaintiff(s)
8   to Officer Labbe (Ex. 5 and Ex. 21) Officer Labbe also admits to speaking
9   with Capt. Larson regarding the Plaintiff(s) traffic stop on December 27,
10  2006 which is the same date Clearlake resident, Teresa Stacey, states she
11  heard the conversation. (Ex. 23 at 2:25-27, 3:1-6)

12      Officer Hobbs and Sgt. Celli again stopped Plaintiff(s) on September 27,
13  2006 while Plaintiff(s) were operating their off-road motorcycle, which was
14  clearly registered, on private property. (Ex. 24)

15      On December 27, 2006 Plaintiff(s) observed Sgt. Celli and Officer Labbe
16  parked at the intersection of Olympic and Lakeshore, Sgt. Celli and Officer
17  Labbe pulled out two cars behind Plaintiff(s) and once Officer Labbe had the
18  opportunity to get behind Plaintiff(s) he pulled Plaintiff(s) over alleging
19  obstruction of license plates, which was a ball hitch. (Ex. 22)  There is no
20  way possible that a ball hitch could obstruct Plaintiff(s) license plates as
21  Officer Labbe alleges (Ex. 25)  Which further shows that these officers were
22  instructed to harass and fabricate reasons for pulling the Plaintiff(s) over
23  as Officer Labbe stated that once he realized that he had the Plaintiff(s)
24  pulled over he notified Sgt. Celli even though he was right behind Officer
25  Labbe. (Ex. 22)  As soon as Plaintiff(s) realized they were again being

- 9

1   pulled over by Sgt. Celli, and on his shift, Plaintiff David Davis told Page
2   Gearhart-Davis to start blowing the horn to get the attention of people in
3   their homes. (Ex. 3 at 95:10-25, 96:1-2)  As Sgt. Celli approached the
4   passenger side Plaintiff(s) heard Sgt. Celli dispatching Plaintiff David
5   Davis' name through dispatch. (Ex. 3 at 96:21-24)  Sgt Celli stood on the
6   passenger side where Plaintiff David Davis was the whole time with his hand
7   on his firearm (Ex. 1 at 4:20-21 and Ex. 3 at 96:13-19)

8        About a week after the incident of December 27, 2006 Plaintiff(s) once
9   again went in and spoke with Defendant(s) to try and resolve the ongoing
10  matter but it was apparent that the Clearlake Police Departments' intentions
11  were set in stone. (Ex. 22)

12       On the afternoon of January 12, 2007 Sgt. Michael Herman came to
13  Plaintiff(s) home to take their statement for complaint for the incident on
14  December 27,2006. (Ex. 22)  Sgt. Michael Herman did not do a proper
15  investigation on Plaintiff(s) claim because he did not follow the Clearlake
16  Police Departments procedures. **Clearlake Police Department Policy 1020**
17  states that all officers and witness are to be interviewed and recording of
18  that interview is to be taken.  Sgt. Michael Herman did not interview nor
19  record Sgt. Celli or Officer Labbe. (Ex. 22)  Sgt. Michael Herman has also
20  made false allegations that he came out to the Plaintiff(s) home on January
21  18, 2008 when in fact Plaintiff(s) statement was taken and completed on
22  January 12,2008. (Ex. 22)  Sgt. Michael Herman also claims at the beginning
23  of the recorded interview that Plaintiff David Davis mentions the alleged 911
24  call hang up which in fact you do not hear David Davis making such a
25  statement. (Ex. 26)

1    Clearlake Police Department intentionally concocted a phony 911-dispatch
2    record on December 17, 2008 and used it as their excuse to come to
3    Plaintiff(s) home to further their harassment against Plaintiff(s) in
4    retaliation against the complaints filed about Sgt. Celli violating
5    Plaintiff(s) 4th & 14th **Amendment Right** to be safe and secure in their own
6    home. (Ex. 27)  The Northern District of California United States District
7    Court issued a Subpoena commanding Lake County Dispatch to produce any 911
8    calls made from Plaintiff(s) home phone during the time period of August
9    2006-June 2007 in which Lake County Dispatch clearly sent a signed Affidavit
10   by Lieutenant Cecil Brown declaring under penalty of perjury that the only
11   record of a 911 call they had made from Plaintiff(s) home during that time
12   period was made on February 10,2007 when Plaintiff David Davis broke his leg
13   and paramedics were requested by Plaintiff(s). (Ex. 28)  Records
14   Communications Supervisor, Nicole Newton, clearly states that the Lake County
15   Sheriffs Department is the designated primary answering point for the County
16   of Lake. (Ex.29)  Defendant(s) fabricated 911 Ali Report clearly states it
17   was dispatched out of Lake County.  (Ex. 27)  This incident further goes to
18   show and prove beyond a reasonable doubt that Sgt. Celli will go to any
19   measure to harass and torment Plaintiff(s) with the department acknowledging
20   and allowing Sgt. Celli to continue his tyrant.

21   Plaintiff(s) have been documented in Defendant(s) system as Anti-Law
22   Enforcement only because Plaintiff(s) have exercised their rights as
23   citizens, or does the United States allow Law Enforcement Agencies have
24   personal vendettas against United States Citizens who committed a couple
25   traffic infractions to be labeled as Anti-Law Enforcement and a threat to the

1   community, which further violates Plaintiff(s) *4th & 14th Amendment Rights.*

2   (Ex. 11 and Ex. 30)

3   **III. ARGUMENT**

4   **A. Violation of *4th & 14th Amendment***

5   Plaintiff(s) were approached by Defendant(s) on 8-2-06 while pumping

6 gas into their vehicle and were not committing any crime, which would

7 constitute rise for suspicion of Clearlake Police Officers. (Ex. 1 and Ex. 2)

8 Defendant(s) try to constitute their reason for briefly detaining

9 Plaintiff(s) behind "reasonable suspicion" that Plaintiff(s) had committed or

10 were about to commit a crime under *Terry v. Ohio 392 U.S. 1 (1968)*. (Ex. 7 at

11 9:5-18) The fact is Plaintiff(s) were detained on 8-2-06 by Defendant(s)

12 because Defendant(s) contend that Plaintiff(s) had no visible license plate

13 on Plaintiff(s) vehicle, when in truth is there is no way Defendant(s) could

14 have visibly seen whether Defendant(s) had a license plate because to pump

15 gas into a 1967 Mercury Cougar you have to turn the license plate down. (Ex.

16 4 and Ex. 5 and Ex. 6 and Ex. 11) Defendant(s) counsel is now trying to

17 change the reason Defendant(s) approached Plaintiff(s)to Defendant(s)

18 approaching Plaintiff(s) because of a cracked windshield, after Plaintiff

19 David Davis brought it to Defendant(s) counsels' attention during his

20 deposition that there is no way Defendant(s) could have possibly viewed the

21 license plate on 8-2-06 while he was pumping gas. (Ex. 3 and Ex. 7)

22   On 8-3-06 Defendant(s) detained Plaintiff David Davis for not having

23 any form of identification. (Ex. 12) Plaintiff David Davis provided

24 Defendant(s) with his California Temporary Driver's License, which DMV

25 specifically told him to use as Identification until his permanent Driver's

1   License arrived in the mail in 4 to 6 weeks. (Ex. 14)  Defendant(s) then
2   removed Plaintiff David Davis from his vehicle, placed handcuffs on him that
3   were visibly too tight, and placed him in the back of his patrol vehicle.
4   (Ex. 12 and Ex. 16)  After Plaintiff David Davis advised Defendant(s) he was
5   having an asthma attack, he was pulled face first onto the ground where
6   Officer Hobbs then placed his knee into his back in which Defendant(s)
7   counsel alleges Officer Hobbs did so in order to remove Mr. Davis's handcuffs
8   and alleviate his asthma symptoms. (Ex. 7 at 12:16-18)  Common sense would
9   have told this officer that throwing someone face first in the dirt and
10  putting his knee into the persons back would not alleviate their asthma
11  symptoms rather it would only be harder for the individual to breath while
12  face down in the dirt and applying pressure onto some ones back would only
13  constrict the longs.  Defendant(s) counsel sights **Atwater v. City of Lago**
14  **Vista, 532 U.S. 318 and Hupp v. City of Walnut Creek, 389 F.Supp.2d 1229** as
15  justified reason for the arrest and detention of Plaintiff David Davis for
16  not wearing his seat belt.  In Atwater's case Texas law provides for police
17  discretion in arresting any person caught committing a misdemeanor, such as
18  violating it's mandatory seat belt laws.  In the state of California not
19  wearing a seat belt is violation of California Vehicle Code § 27315(e), which
20  is an only an infraction not a misdemeanor.  In the case of Hupp, Hupp
21  refused to sign a "promise to appear", which is why he was arrested.
22  Defendant(s) counsel is sighting cases which have no baring nor similarity to
23  this case.

24       On 8-3-06 Plaintiff Page Gearhart-Davis had a valid California
25  Drivers License. (Ex. 19)  Plaintiff(s) vehicle was still illegally searched

1   and towed. (Ex. 18)  Plaintiff(s) were both illegally searched on 8-3-06
2   while they were detained by Defendant(s).

3   **B. Racial Profiling**

4       Defendant(s) contend that Plaintiff(s) have produced no evidence of
5   discriminatory intent as stated in **Snowden v. Hughs, 321 U.S. 1.** (Ex. 7 at
6   14:9-10)  Plaintiff(s) were approached by Defendant(s) on 8-2-06 while
7   pumping gas into their vehicle where Defendant(s) used the excuse of
8   Plaintiff(s) not having a license plate, when in fact there is no way they
9   could have noticed Plaintiff(s) license plate because when you pump gas into
10  a 1967 Mercury Cougar the license plate is turned down. (Ex. 4 and Ex. 5 and
11  Ex. 6 and Ex. 11)  Whether Defendant(s) approached Plaintiff(s) because of
12  their color, their appearance, tattoos, or any other category it is still
13  evident they were profiled by Defendant(s) since they had no reason to
14  approach Plaintiff(s).

15      Defendant(s) claim Officer Miller told Plaintiff(s) "we don't like
16  your kind" and "you need to move" claiming it was said after Plaintiff David
17  Davis called him an "out of shape pig", when in fact Defendant(s) told
18  Plaintiff(s) "we don't like your kind of people" and "You need to move"
19  first. (Ex. 3 at 30:19-25 and 31:1-12)

20      Defendant(s) further claim Plaintiff(s) have turned over no evidence
21  that show Defendant(s) used any racial slurs or epithets at Plaintiff(s) when
22  in fact Plaintiff(s) have already stated and turned over evidence of the
23  conversation Teresa Stacy heard Capt. Larson and Officer Labbe had and
24  Officer Labbe also informed Sgt. Michael Herman he had spoke with Capt.
25  Larson the day after he pulled Plaintiff(s) over. (Ex. 21 and Ex. 22)

If a Supervisor at your job were to tell you "I don't you're your kind" and the supervisor admitted to saying it he or she would no longer be a Supervisor at that place of employment.  For a person of authority to approach somebody after they move into a residential neighborhood and tell them "you need to move" it would not only be considered a racist statement but more seriously a threat.  What Defendant(s) view to be racist or not is merely only their personal opinions.

### C. Violation of *42 U.S.C §§ 241 & 1985*

Plaintiff(s) are United States Citizens whom are entitled to U.S. Constitutional Laws and Rights.  Plaintiff(s) have pointed out from their First Amended Claim and evidence turned over that Defendant(s) employ Officers who have conspired to injure, oppress, threaten and intimidate Plaintiff(s).  (Ex. 1)

### D. Violation of *42 U.S.C §§ 242 & 1983*

*42 U.S.C § 242* states that anybody under the color of law who willfully subjects any person in any state the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or Laws of the United States.  As clearly pointed out in above statements Defendant(s), under the color of law, have deprived Plaintiff(s) their rights, privileges, and immunities secured and protected by the Constitution and Laws of the United States. (See Above)

### E. Failure to Supervise Officers Adequately

The Clearlake Police Department does not monitor complaints filed against its officers as means of detecting problems before they occur. Clearlake Police Officers with complaint histories can and have been

1   promoted.  Some of Clear Lake's own employees went to the Federal Bureau of

2   Investigation regarding corruption within the Clear Lake Police Department.

3   (Ex. 1 at 9:6-11 and Ex. 2 - statement neither admitted nor denied)  **F.R.C.P.**

4   **8(d)** states you are considered to have admitted every statement that you do

5   not specifically deny, except for the amount of damages.

6        9 Federal Lawsuits within the last 5 years shows that Clearlake Police

7   Department does not supervise it's officers and clearly shows that The City

8   of Clearlake and it's Official's are fully aware of the ongoing problems.

9   (**Bygum v. City of Clearlake, Griffin v. City of Clearlake C-00-2504,**

10  **Hernandez v. City of Clearlake C-99-3185, Simmons v. City of Clearlake C-98-**

11  **1251 and Vespa v. City of Clearlake C-97-3756**) The City and all it's

12  employees seek refuge behind attorney's and then continue on with the same

13  misconduct.

14       Within the last 5 years Defendant(s) have received numerous complaints

15  against the same Offices in question for the same type of misconduct.

16  (Exhibit E1, Exhibit G1, Exhibit H1)

17       On 6-8-03 Sgt. Celli followed a citizen by the name of Theodore Edwards

18  in his truck, visibly drunk after drinking 7 beers and 3 shots of Tequila

19  that day. (Exhibit E-1)  Three Clearlake Police Officers, Officer Carl

20  Miller, Officer Brady and Sgt. Michael Herman all admit to having witnessed

21  Sgt. Celli and did not attempt to stop him from driving. (Exhibit E-1)  Sgt.

22  Celli grabbed and shoved Theodore Edwards and then threatened him that he

23  "had better watch his rearview mirror" and that he "was going to have his

24  ass". (Exhibit E-1)  Theodore Edwards stated that Sgt. Celli followed him

25  around town and even drove by his house. (Exhibit E-1)  Officer Brady stated

1   that he heard Sgt. Celli yelling something at Theodore Edwards and that Sgt.

2   Celli was the aggressor. (Exhibit E-1)

3       On 8-13-07 Officer Hobbs stopped Ryan Buchanan in front of his residence

4   alleging he had turned without signaling and then forcefully removed him from

5   his vehicle and hit him with his baton because of his tattoos. (Exhibit G-1)

6   On 12-28-07 Officer Hobbs had made rude and unprofessional comments to

7   Elizabeth Gomes in which his comments were only made because of her

8   boyfriend. (Exhibit G-1)

9       On July 17th and 18th of 2007 Officer Miller followed Jason Pearce home

10  and harassed him because of his race. (Exhibit H-1)   Jason Pearce stated

11  Officer Miller stopped and harassed him again a week after these two

12  incidents. (Exhibit H-1)   On 8-4-07 Officer Miller received documented

13  counseling in regards to complaints and interactions with citizens. (Exhibit

14  H-1)   Sgt. Rodd Joseph states that he had received three similar complaints

15  on Officer Miller in one month. (Exhibit H-1)   Sgt. Celli stated that Officer

16  Miller has a tendency to talk down to people. (Exhibit 11)

17  **IV.    CONCLUSION**

18      The Defendant(s) request the Court dismiss Plaintiff(s) First Amended

19  Complaint.   The City of Clearlake is merely asking the Court to ignore

20  Plaintiff(s) First Amended Complaint as well as Plaintiff(s) U.S. Civil

21  Rights as United States Citizens.   The foundation of Plaintiff(s) claim is

22  not based on opinions but facts.   The employees of the City of Clearlake set

23  out to purposely take advantage of their authority.

24      The City of Clearlake as well as the Clearlake Police Department were

25  fully aware of Plaintiff(s) constant harassment by Clearlake Police Officers.

1  Plaintiff(s) wrote newspaper articles regarding Plaintiff(s) problems.
2  Plaintiff(s) had monthly meetings regarding police misconduct.  Plaintiff(s)
3  spoke of their problems at City Hall meetings.  Plaintiff(s) went into the
4  Clearlake Police Department to try and resolve the matter.  Plaintiff(s)
5  wrote letters to the Attorney General.  Plaintiff(s) held a meeting at their
6  home along with the Ella Baker Department as well as the Department of
7  Justice.  A representative from the Department of Justice by the name of
8  Booker Neal went in to speak with the then Interim Chief of Police about
9  problems Clearlake Citizens were having.  Clearlake City Employees even went
10  in and spoke with the Federal Bureau of Investigation about problems they
11  were aware of that were going on.

12      Plaintiff(s) have suffered constant harassment when their intentions
13  were to seek some sort of remedy for stopping Defendant(s) from constantly
14  tormenting and abusing it's authority, yet here the Defendant(s) pray for
15  relief.

16
17
18  Dated this July 22nd, 2008                Respectfully Submitted,
19
20                                            David Davis and Page Gearhart-Davis
21
22
23
24
25

- 18

Exhibit 1

1  David Davis and Page Gearhart-Davis
   PRO SE
2  PO Box 3225
   Clearlake, CA 95422
3  (707) 995-0749

RECEIVED

AUG 2 3 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

FILED

AUG 2 3 2007

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

4

        IN THE UNITED STATES DISTRICT COURT FOR

5

           THE NORTHERN DISTRICT OF CALIFORNIA

6

                 SAN FRANCISCO DIVISION

7

8

9  David Davis and Page Gearhart-Davis    Case No.: C 07-03365 EDL

   PRO-SE,                                 FIRST AMENDED COMPLAINT
10

                Plaintiff(s),
11

        vs.
12

   Clearlake Police Department,
13

                Defendant(s)
14

15

   Plaintiff David Davis and Page Gearhart- Davis for its Complaint alleges as
16
   follows:
17

   JURISDICTION
18

   The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as
19
   this action arises under the laws of the United States Constitution.
20

   VENUE
21

   Venue is appropriate in this court because both the plaintiffs and the
22
   defendants reside in this district, and the acts and omissions giving rise to
23
   this lawsuit occurred in this district.
24

   ALLEGATIONS
25

   1. On 8-2-06 while David Davis and Page Gearhart-Davis where pumping gas into
26

                                    - 1

1  their vehicle they were approached by two officers who's names are Officer

2  Miller and Sgt. Celli.  David Davis was asked if the vehicle was his, if he

3  had drivers license, registration, and proof of insurance.  After David Davis

4  provided the officers with the appropriate information (Exhibit A [Mercury

5  Cougar was sold so David Davis no longer has the registration and

6  insurance]), he asked the officers if they usually approached people while

   they pump gas into their cars.  Officer Miller stated to David Davis "We

8  don't like your kind", as Sgt. Celli began looking into David Davis vehicle.

9  David Davis was issued a ticket for no registration and a defective

10 windshield (Exhibit B), which later was dismissed in court (Exhibit C).

11 2. The following day David Davis and Page Gearhart-Davis went down to the

12 police station to file a complaint against Officer Miller and Sgt. Celli for

13 racial profiling, harassment, and racial statements.  The officer in charge

14 of the day was Capt. Larson, who stated he would speak to his officers about

15 the matter and there was no need for David Davis and Page Gearhart-Davis to

16 file a complaint against Sgt. Celli and Officer Miller.

17 3. Later that same day on the same shift from the night before, David Davis

18 and Page Gearhart-Davis were pulled over again alleging they had ran a stop

19 sign, made a turn without signaling, and having an obstacle blocking the

20 license plate; which later in court the officer did not know what the

21 obstacle was.  As Officer Hobbs and Officer Hardisty approached the vehicle,

22 Officer Hobbs instantly asked David Davis if he had an attitude.  David Davis

23 did not answer him.  Then Officer Hobbs asked David Davis why he did not have

24 a seat belt on.  David Davis said he forgot.  Officer Hobbs then asked David

25 Davis for some identification.  David Davis told him all he had was a DMV

26 print out of his Interim Drivers License (Exhibit A), since his license was

1   recently renewed.  In Officer Hobbs' report (Exhibit D), it states David

2   Davis handed him a piece of paper which shows false detainment.  Officer

3   Hobbs insisted on photo identification.  Officer Hobbs then removed David

4   Davis from the vehicle, placed him in handcuffs, and placed him in the back

5   of his police car.  While David Davis was detained in the vehicle, he had an

6   asthma attack.  While David Davis was having his asthma attack, the officer

7   from the previous night at the gas station, Sgt. Celli, pulled up.  After

8   Sgt. Celli got out of his car, Officer Hobbs pulled David Davis out of his

9   vehicle; while he was still in handcuffs, onto his stomach, and placed his

10  knee into David Davis' back.  While David Davis was being detained Officer

11  Hardisty approached Page Gearhart-Davis and asked her for her drivers

12  license, registration, and insurance.  Page Gearhart-Davis heard David Davis

13  bellering, coughing, and saying he could not breath.  Officer Hardisty walked

14  back to where Officer Hobbs and Sgt. Celli were and came back shortly and

15  told Page Gearhart-Davis that everything was alright, that David Davis was

16  having an asthma attack, and that an ambulance was on it's way.  The

17  handcuffs were removed minutes before the ambulance arrived.  Once David

18  Davis was put into the back of the ambulance to be administered an albuterhal

19  treatment before being sent to the hospital, Sgt. Celli approached the back

20  of the ambulance.  At that point, David Davis refused to ride along in the

21  ambulance fearing for his life.  David Davis and Page Gearhart-Davis' vehicle

22  was towed due to non-payment of Page Gearhart-Davis' driver license renewal.

23  Page Gearhart-Davis was issued a ticket for driving without a license and

24  turning without using a signal light (Exhibit E).  Later in court, the

25  turning without a signal light was dismissed (Exhibit F).  David Davis was

26  issued a ticket for not wearing his seatbelt, in which, Officer Hobbs forged

- 3 -

1  David Davis' signature (Exhibit G).  Later in court, the ticket for not

2  wearing a seat belt was suspended (Exhibit H).

3  4. After David Davis and Page Gearhart-Davis received these three tickets on

4  the same evening shift, with the same sergeant, Sgt. Celli on command, three

5  more tickets (Exhibit I and J [last ticket is on file with the court because

6  it was a fix-it ticket that was signed by a Lake Co. Sheriff]) were given on

7  this same shift to David Davis and Page Gearhart-Davis under the direction of

8  Sgt. Celli.  At every single stop that was made Sgt. Celli was always present

9  or called out to the scene, showing a pattern of constant harassment, which

10 left David Davis and Page Gearhart-Davis in fear to leave their home during

11 Sgt. Celli's evening shift.

12 5. On December 27, 2006, David Davis and Page Gearhart-Davis observed Sgt.

13 Celli and Officer Labbe parked at the intersection of Lakeshore and Olympic.

14 As David Davis and Page Gearhart-Davis turned at the intersection of Olympic

15 and Lakeshore, David Davis and Page Gearhart-Davis observed Officer Labbe and

16 Sgt. Celli pull out and were two cars behind them.  As David Davis and Page

17 Gearhart-Davis turned onto Pomo Street Officer Labbe and Sgt. Celli got

18 directly behind David Davis and Page Gearhart-Davis' vehicle and pulled them

19 over.  Officer Labbe approached the driver's side of Page Gearhart-Davis and

20 Sgt. Celli approached the passenger side of David Davis.  Sgt. Celli stood at

21 David Davis' side with his hand on his gun.  Page Gearhart-Davis asked

22 Officer Labbe what they were pulled over for.  Officer Labbe said for not

23 using a turn signal and for the ball hitch obstructing the license plate.

24 Page Gearhart-Davis gave Officer Labbe her driver license, insurance, and

25 registration (Exhibit K-M).  While Officer Labbe went back to his vehicle

26 Sgt. Celli remained on David Davis' side with his hand on his gun.  When

- 4

1  Officer Labbe returned, he gave Page Gearhart-Davis a ticket alleging

2  obstruction of license plate, expired registration, which had just expired on

3  December 22, and a non-operative tale light.

4  6. The following day, David Davis and Page Gearhart-Davis received a phone

5  call from another resident of Clear Lake, Teresa Stacey.  Teresa Stacey

6  informed Page Gearhart-Davis she had heard a conversation at the police

7  station between Officer Labbe and Capt. Ron Larsen in regards to the incident

8  from the night before (Exhibit N).

9  7. During the course of August 2006 to December 2006 David Davis and Page

10  Gearhart-Davis, along with other witnesses and neighbors, observed Sgt. Celli

11  constantly riding past David Davis and Page Gearhart-Davis' home.  On one

12  occasion Sgt. Celli came to David Davis and Page Gearhart-Davis' home,

13  shining lights into their windows, and alleged they had received a 911 phone

14  call from David Davis and Page-Gearhart-Davis' home (on video).  Later when

15  Page Gearhart-Davis called the Lake County Sheriff's dispatch, which is where

16  the officer Sgt. Celli was with said the 911 call was dispatched from, they

17  had no record of a 911 call from the landline at David Davis and Page

18  Gearhart-Davis' home.

19  8. After David Davis and Page Gearhart-Davis' second encounter with the

20  police of August 3, David Davis and Page Gearhart-Davis organized monthly

21  meetings with the community of Clear Lake regarding police misconduct

22  (Exhibit O), which later, the Department of Justice also became involved.

23  Current and past employees within the Clearlake Police Department have also

24  come forward regarding misconduct and unlawful acts within the department.

25  While Judy Thein; now mayor of Clear Lake, was running for office one of her

26  main platforms was getting rid of the 'good old boys' (Exhibit P).

- 5

1    9. Violation of Civil Rights under the Conspiracy Against Rights of Citizens,
2    18 U.S.C. § 241

3    Sgt. Celli and other Clear Lake Police Officers conspired under the direct
4    supervision of Sgt. Celli to injure, oppress, threaten, and intimidate David
5    Davis and Page Gearhart-Davis. The pattern of harassment, which only occurred
6    on Sgt. Celli's shift, at which each encounter Sgt. Celli was present, caused
7    David Davis and Page Gearhart-Davis to feel threatened and intimidated by
8    Clearlake Police officers.  David Davis and Page Gearhart-Davis were
9    oppressed and were fearful to leave their home during Sgt. Celli's shift.
10   10. Violation of Civil Rights under the Deprivation of Rights Under Color of
11   Law, 18 U.S.C. § 242

12   Sgt. Celli and other Clear Lake Police Officers under color of law willfully
13   subjected David Davis and Page Gearhart-Davis to the deprivation of their
14   rights and privileges secured and protected by the Constitution, and to
15   punishments, pains, and penalties by reason of David Davis and Page Gearhart-
16   Davis' color and race.  On August 2-06, Sgt. Celli and Officer Miller
17   approached and harassed David Davis and Page Gearhart-Davis only because of
18   their color and race.  The following evening Officer Hobbs, under the
19   direction of Sgt. Celli, continued with such harassment of David Davis and
20   Page Gearhart-Davis.  Officer Hobbs also falsely detained David Davis after
21   he showed him his only form of identification, his Interim Driver License,
22   since his license was recently renewed.  Officer Hobbs used excessive force
23   upon David Davis when he pulled him out of the back of his police car while
24   in hand cuffs, onto his stomach, and putting his knee into David Davis' back,
25   while David Davis was having an asthma attack.  Officer Hobbs forged David
26   Davis signature to the ticket he gave David Davis and then fabricated a

- 6

1   report about the incident, which later was signed by Sgt. Celli.

2   11.<u>Violation of Civil Rights under the Law Enforcement Misconduct Statute, 42</u>

3   <u>U.S.C. § 14141</u>

4   David Davis and Page Gearhart-Davis were living in Clear Lake for over a year

5   and never encountered any form of harassment until 8-2-06.  The pattern of

6   Sgt. Celli's excessive harassment shows his intentions were completely

7   directed to threaten and intimidate David Davis and Page Gearhart-Davis.  The

8   harassment David Davis and Page Gearhart-Davis experienced did not come to a

9   stop until a representative from the Department of Justice became involved

10   and spoke with the interim Chief of Police regarding the Clearlake Police

11   Officers' misconduct.

12   12.<u>Violation of Civil Rights under the Civil Action For Deprivation of</u>

13   <u>Rights, 42 U.S.C. § 1983</u>

14   Each Clear Lake Police Officer involved in this misconduct should be held

15   responsible for their actions and involvement in which this complaint clearly

16   points out the harassment of these officers on Sgt. Celli's shift.

17   13.<u>Violation of Civil Rights under the Conspiracies to Interfere With Civil</u>

18   <u>Rights, 42 U.S.C. § 1985</u>

19   After being harassed numerous times on Sgt. Celli's night shift, David Davis

20   and Page Gearhart-Davis were intimidated and felt in fear to leave there

21   home.  After David Davis and Page Gearhart-Davis filed complaints for some

22   sort of relief, David Dais and Page Gearhart-Davis found it only made matters

23   worse, Clear Lake Police Officers retaliated against complaints filed about

24   their misconduct.

25   14.<u>Violation of the United States Constitution, Forth Amendment</u>

26   David Davis and Page Gearhart-Davis were approached by Officer Miller and

- 7

1  Sgt. Celli on 8-2-06 and unlawfully questioned while David Davis and Page

2  Gearhart-Davis were pumping gas into their vehicle.  The following evening of

3  8-3-06 Officer Hobbs unreasonably searched David Davis after falsely

4  detaining him.  Officer Hardisty unreasonably searched Page Gearhart-Davis

5  after asking her to leave her vehicle so it could be towed.

6  15. Violation of the United States Constitution, Fourteenth Amendment

7  David Davis and Page Gearhart-Davis were deprived their liberty to leave

8  their home during Sgt. Celli's shift because of all the undue harassment

9  which always occurred during his evening shift.  All the harassment David

10  Davis and Page Gearhart-Davis received from Sgt. Celli and other officers on

11  his shift started in August-06 and ended in December-06, only after a

12  representative from the Department of Justice spoke with the Interim Chief of

13  Police about his involvement with what was going on.  Because of the

14  excessive force used by Officer Hobbs on 8-3-06 on David Davis, David Davis

15  and Page Gearhart-Davis were in fear of their lives every time after they

16  were stopped by Clear Lake Police Officers.

17  16. Use of Excessive Force, False Detainment, Forged Documents

18  Clearlake Police Department officers used excessive force when falsely

19  detaining David Davis in violation of the Forth and Fourteenth Amendments to

20  the United States Constitution.  Clearlake Police Department Officers have

21  used racial epithets or racially insensitive language directed against David

22  Davis and Page Gearhart-Davis.  Complaints filed against the Clearlake Police

23  Department by David Davis and Page Gearhart-Davis have resulted in no

24  discipline being imposed against any Clearlake Police Officer.

25  17. Failure to Investigate Complaints Properly

26  The Clearlake Police Department gives greater weight to the statements of its

- 8

1 | police officers, while discounting statements of witnesses for the complaint,
2 | does not fully collect all evidence during its investigations, and does not
3 | consider an officer's prior complaint history in its investigation. Clear
4 | Lake Police Officers are being hired and promoted without the proper
5 | qualifications or requirements and training.

6 | 18. Failure to Supervise Officers Adequately

7 | The Clearlake Police Department does not monitor complaints filed against its
8 | officers as a means of detecting problems before they occur.  Clearlake
9 | Police Officers with complaint histories can and have been promoted.  Some of
10 | Clear Lake's own employees went to the Federal Bureau of Investigation
11 | regarding corruption within the Clear Lake Police Department.

12 | RELIEF

13 | (A) Compensation for punitive damages due to; but not limited to, violation of
14 | Civil Rights, violation of Constitutional Rights, racial profiling, false
15 | detainment, excessive force, illegal search and seizure, name forgery,
16 | falsifying police reports, harassment, stress, and humiliation.

17 | (B) Any officers to be found guilty of any civil or criminal charges to be
18 | prosecuted.

19 | (C) Conduct a full investigation into the Clear Lake Police Department and
20 | Employees (past and present).

21 | (D) Grant such other and additional relief as this Court may deem just and
22 | proper.

23 | Trial By Jury

24 | Plaintiff, David Davis and Page Gearhart-Davis, request a jury trial pursuant
25 | to Rule 38, Section B of The Federal Rules of Civil Procedure.

26 |

1 | Dated:  8-22-07

Respectfully Submitted,

David Davis and
Page Gearhart-Davis

Exhibit 2

1  DALE L. ALLEN, JR., # 145279
   DIRK D. LARSEN, # 246028
2  LOW, BALL & LYNCH
   505 Montgomery Street, 7th Floor
3  San Francisco, California 94111-2584
   Telephone (415) 981-6630
4  Facsimile (415) 982-1634

5  Attorneys for Defendant
   CITY OF CLEARLAKE
6  (erroneously named herein as CLEARLAKE POLICE DEPARTMENT)

7

8              IN THE UNITED STATES DISTRICT COURT FOR

9              THE NORTHERN DISTRICT OF CALIFORNIA

10                    SAN FRANCISCO DIVISION

11  DAVID DAVIS and PAGE GEARHART-DAVIS       )    Case No. C 07-03365 EDL
    PRO-SE,                                   )
12                                            )    DEFENDANT CITY OF
                        Plaintiffs,           )    CLEARLAKE (erroneously named
13                                            )    herein as CLEARLAKE POLICE
                 vs.                          )    DEPARTMENT)'S ANSWER TO
14                                            )    VERIFIED FIRST AMENDED
    CLEARLAKE POLICE DEPARTMENT,              )    COMPLAINT; DEMAND FOR
15                                            )    JURY TRIAL
                        Defendants.           )
16                                            )
                                              )
17

18        Comes now defendant City of Clearlake , erroneously named herein as Clearlake Police

19  Department, and in answer to the verified first amended complaint on file herein admits, and alleges as

20  follows:

21                                    1.

22        In answer to the allegations on page 1, lines 18-19 of the complaint, this defendant has no

23  information or belief to enable it to answer said allegations, and for that reason and basing its denial on

24  that ground, denies both generally and specifically, each and every, all and singular, the allegations

25  contained therein.

26                                    2.

27        In answer to the allegations on page 1, lines 21-23 of the complaint, this defendant has no

28  information or belief to enable it to answer said allegations, and for that reason and basing its denial on

1    that ground, denies both generally and specifically, each and every, all and singular, the allegations

2    contained therein.

3                 3.

4       In answer to the allegations of ¶1, pages 1:26-2:2 ending with "Celli" of the complaint, Admit. ← β-1

5                 4.

6       In answer to the allegations of ¶1, page 2:3 at "After" and ending at line 8 with "vehicle." of the

7    complaint, this defendant has no information or belief to enable it to answer said allegations, and for that

8    reason and basing its denial on that ground, denies both generally and specifically, each and every, all

9    and singular, the allegations contained therein.

10                5.

11       In answer to the allegations of ¶1, page 2:9 ending at page 2:10 at "Exhibit B" of the complaint,

12    Admit.

13                6.

14       In answer to the allegations of ¶1, page 2:10 at "which" and ending at "Exhibit C" of the

15    complaint, this defendant has no information or belief to enable it to answer said allegations, and for that

16    reason and basing its denial on that ground, denies both generally and specifically, each and every, all

17    and singular, the allegations contained therein.

18                7.

19       In answer to the allegations of ¶2, page 2:11 ending at page 2:13 at "statements" of the

20    complaint, Admit.

21                8.

22       In answer to the allegations of ¶2, page 2:13 at "The" and ending at page 2:14 at "Larson" of the

23    complaint, Admit.                                     ← β-2

24                9.

25       In answer to the allegations of ¶2, page 2:14 at "who" and ending at page 2:16 of the complaint,

26    this defendant has no information or belief to enable it to answer said allegations, and for that reason and

27    basing its denial on that ground, denies both generally and specifically, each and every, all and singular,

28    the allegations contained therein.

1                                         10.

2       In answer to the allegations of ¶3, page 2:17 ending at page 2:20 at "plate" of the complaint,

3    Admit.

4                                         11.

5       In answer to the allegations of ¶3, page 2:20 at "which" and ending at page 2:21 at "was" of the

6    complaint, this defendant has no information or belief to enable it to answer said allegations, and for that

7    reason and basing its denial on that ground, denies both generally and specifically, each and every, all

8    and singular, the allegations contained therein.

9                                         12.

10      In answer to the allegations of ¶3, page 2:21 at "As" and ending at page 2:24 at "forgot" of the

11   complaint, this defendant has no information or belief to enable it to answer said allegations, and for that

12   reason and basing its denial on that ground, denies both generally and specifically, each and every, all

13   and singular, the allegations contained therein.

14                                        13.

15      In answer to the allegations of ¶3, page 2:24 at "Officer" ending at page 2:25 at "identification"

16   of the complaint, Admit.

17                                        14.

18      In answer to the allegations of ¶3, page 2:25 at "David" and ending at page 3:3 at "identification"

19   of the complaint, this defendant has no information or belief to enable it to answer said allegations, and

20   for that reason and basing its denial on that ground, denies both generally and specifically, each and

21   every, all and singular, the allegations contained therein.

22                                        15.

23      In answer to the allegations of ¶3, page 3:3 at "Officer" ending at page 3:5 at "car" of the

24   complaint, Admit.

25                                        16.

26      In answer to the allegations of ¶3, page 3:5 at "While" ending at page 3:22 at "renewal" of the

27   complaint, this defendant has no information or belief to enable it to answer said allegations, and for

28   that reason and basing its denial on that ground, denies both generally and specifically, each and every,

-3-

1   all and singular, the allegations contained therein.

2                    17.

3       In answer to the allegations of ¶3, page 3:23 at "Page" ending at page 3:24 at "Exhibit E" of the

4   complaint, this defendant has no information or belief to enable it to answer said allegations, and for that

5   reason and basing its denial on that ground, denies both generally and specifically, each and every, all

6   and singular, the allegations contained therein.

7                    18.

8       In answer to the allegations of ¶3, page 3:24 at "Later" and ending at page 3:25 at "Exhibit F" of

9   the complaint, this defendant has no information or belief to enable it to answer said allegations, and for

10   that reason and basing its denial on that ground, denies both generally and specifically, each and every,

11   all and singular, the allegations contained therein.

12                    19.

13       In answer to the allegations of ¶3, page 3:25 at "David" and ending at page 4:2 at "Exhibit H" of

14   the complaint, this defendant has no information or belief to enable it to answer said allegations, and for

15   that reason and basing its denial on that ground, denies both generally and specifically, each and every,

16   all and singular, the allegations contained therein.

17                    20.

18       In answer to the allegations of paragraph 4 of the complaint, this defendant has no information or

19   belief to enable it to answer said allegations, and for that reason and basing its denial on that ground,

20   denies both generally and specifically, each and every, all and singular, the allegations contained therein.

21                    21.

22       In answer to the allegations of paragraph 5 of the complaint, this defendant has no information or

23   belief to enable it to answer said allegations, and for that reason and basing its denial on that ground,

24   denies both generally and specifically, each and every, all and singular, the allegations contained therein.

25                    22.

26       In answer to the allegations of paragraph 6 of the complaint, this defendant has no information or

27   belief to enable it to answer said allegations, and for that reason and basing its denial on that ground,

28   denies both generally and specifically, each and every, all and singular, the allegations contained therein.

1                                        23.

2          In answer to the allegations of paragraph 7 of the complaint, this defendant has no information or

3    belief to enable it to answer said allegations, and for that reason and basing its denial on that ground,

4    denies both generally and specifically, each and every, all and singular, the allegations contained therein.

5                                        24.

6          In answer to the allegations of paragraph 8 of the complaint, this defendant has no information or

7    belief to enable it to answer said allegations, and for that reason and basing its denial on that ground,

8    denies both generally and specifically, each and every, all and singular, the allegations contained therein.

9                                        25.

10         In answer to the allegations of paragraph 9 of the complaint, this defendant denies both generally

11   and specifically, each and every, all and singular, the allegations contained therein.

12                                       26.

13         In answer to the allegations of paragraph 10 of the complaint, this defendant denies both

14   generally and specifically, each and every, all and singular, the allegations contained therein.

15                                       27.

16         In answer to the allegations of paragraph 11 of the complaint, this defendant denies both

17   generally and specifically, each and every, all and singular, the allegations contained therein.

18                                       28.

19         In answer to the allegations of paragraph 12 of the complaint, this defendant denies both

20   generally and specifically, each and every, all and singular, the allegations contained therein.

21                                       29.

22         In answer to the allegations of paragraph 13 of the complaint, this defendant denies both

23   generally and specifically, each and every, all and singular, the allegations contained therein.

24                                       30.

25         In answer to the allegations of paragraph 14 of the complaint, this defendant denies both

26   generally and specifically, each and every, all and singular, the allegations contained therein.

27                                       31.

28         In answer to the allegations of paragraph 15 of the complaint, this defendant denies both

1  generally and specifically, each and every, all and singular, the allegations contained therein.

2                                      32.

3       In answer to the allegations of paragraph 16 of the complaint, this defendant denies both

4  generally and specifically, each and every, all and singular, the allegations contained therein.

5                                      33.

6       In answer to the allegations of paragraph 17 of the complaint, this defendant denies both

7  generally and specifically, each and every, all and singular, the allegations contained therein.

8

9                        FIRST AFFIRMATIVE DEFENSE

10      AS AND FOR A FIRST, SEPARATE AND DISTINCT DEFENSE, DEFENDANT ALLEGES:

11      That plaintiffs assumed the risk of any injuries and/or damages resulting from the matters set

12  forth in said complaint, and that said assumption of risk by plaintiffs was a cause of the injuries and/or

13  damages alleged by plaintiffs, if any there were.

14                       SECOND AFFIRMATIVE DEFENSE

15      AS AND FOR A SECOND, SEPARATE AND DISTINCT DEFENSE, DEFENDANT

16  ALLEGES:

17      That plaintiffs were themselves negligent and careless in and about the matters and events set

18  forth in the complaint, and that said negligence contributed to their alleged injuries and/or damages. A

19  verdict of the jury in favor of plaintiffs, if any, which may be rendered in this case must therefore be

20  reduced by the percentage that plaintiffs' negligence contributed to the accident and injuries complained

21  of, if any there were.

22                        THIRD AFFIRMATIVE DEFENSE

23      AS AND FOR A THIRD, SEPARATE AND DISTINCT DEFENSE, DEFENDANT ALLEGES:

24      That the complaint does not state facts sufficient to constitute a cause of action against this

25  answering defendant.

26

27  //

28  //

-6-

1                         FOURTH AFFIRMATIVE DEFENSE

2          AS AND FOR A FOURTH, SEPARATE AND DISTINCT DEFENSE, DEFENDANT

3    ALLEGES:

4          Plaintiffs' cause of action is barred by reason of the provisions of California Code of Civil

5    Procedure sections 335.1, 340 and 343.

6                          FIFTH AFFIRMATIVE DEFENSE

7          AS AND FOR A FIFTH, SEPARATE AND DISTINCT DEFENSE, DEFENDANT ALLEGES:

8          Plaintiffs failed to mitigate their damages.

9                          SIXTH AFFIRMATIVE DEFENSE

10         AS AND FOR A SIXTH, SEPARATE AND DISTINCT DEFENSE, DEFENDANT ALLEGES:

11         Plaintiffs were guilty of willful misconduct and wanton and reckless behavior in and about the

12   matters and events set forth in said complaint; and that said willful misconduct and wanton and reckless

13   behavior contributed to the injuries and damages alleged, if any there were.

14                        SEVENTH AFFIRMATIVE DEFENSE

15         AS AND FOR A SEVENTH, SEPARATE AND DISTINCT DEFENSE, DEFENDANT

16   ALLEGES:

17         Prior to the time when defendant is alleged to have committed the acts complained of, plaintiffs

18   invited, gave permission to, and consented to the acts alleged in the complaint.  Each of the acts alleged

19   in the complaint, which acts are expressly denied, was done within the scope of this consent and

20   permission.

21                         EIGHTH AFFIRMATIVE DEFENSE

22         AS AND FOR A EIGHTH, SEPARATE AND DISTINCT DEFENSE, DEFENDANT

23   ALLEGES:

24         Should plaintiffs recover non-economic damages against any defendant, the liability for non-

25   economic damages is limited to the degree of fault and several liability of said defendant pursuant to

26   Civil Code section 1431.2 and a separate, several judgment shall be rendered against said defendant

27   based upon said defendant's degree of fault and several liability.

28   //

1    NINTH AFFIRMATIVE DEFENSE

2    AS AND FOR A NINTH, SEPARATE AND DISTINCT DEFENSE, DEFENDANT ALLEGES:

3    Defendant's alleged employees mentioned in plaintiffs' complaint were, at all times, duly

4    qualified, appointed and acting police officers of City of Clearlake and peace officers of the State of

5    California and in accordance with the Constitution of the United States and the State of California and

6    the laws of the United States and the laws of the State of California; and at all times mentioned herein,

7    said officers were engaged in the performance of their regularly assigned duties within the scope of their

8    duties as peace officers of the City of Clearlake.

9    TENTH AFFIRMATIVE DEFENSE

10    AS AND FOR A TENTH, SEPARATE AND DISTINCT DEFENSE, DEFENDANT

11    ALLEGES:

12    This answering defendant acted in good faith and with a reasonable belief that the actions were

13    lawful and further did not directly or indirectly perform any acts whatsoever which would constitute a

14    breach of any duty owed to plaintiffs.

15    ELEVENTH AFFIRMATIVE DEFENSE

16    AS AND FOR AN ELEVENTH, SEPARATE AND DISTINCT DEFENSE, DEFENDANT

17    ALLEGES:

18    The acts of this answering defendant was lawful and proper and in all respects was reasonable

19    and legal.

20    TWELFTH AFFIRMATIVE DEFENSE

21    AS AND FOR A TWELFTH, SEPARATE AND DISTINCT DEFENSE, DEFENDANT

22    ALLEGES:

23    In this connection probable cause existed to believe that plaintiffs had committed a public

24    offense and, therefore, probable cause existed to detain and/or arrest plaintiffs.

25    THIRTEENTH AFFIRMATIVE DEFENSE

26    AS AND FOR A THIRTEENTH, SEPARATE AND DISTINCT DEFENSE, DEFENDANT

27    ALLEGES:

28    At all times relevant to this litigation, plaintiffs were subject to restraint as was reasonably

-8-

1    necessary for their detention and/or arrest.

2                              FOURTEENTH AFFIRMATIVE DEFENSE

3            AS AND FOR A FOURTEENTH, SEPARATE AND DISTINCT DEFENSE, DEFENDANT

4    ALLEGES:

5            At all times relevant to this litigation, reasonable cause existed to believe that plaintiffs had

6    committed a public offense and, therefore, reasonable force was used to effect plaintiffs' arrest, to

7    prevent escape or to overcome resistance.

8                              FIFTEENTH AFFIRMATIVE DEFENSE

9            AS AND FOR A FIFTEENTH, SEPARATE AND DISTINCT DEFENSE, DEFENDANT

10   ALLEGES:

11           At all times relevant to this litigation, plaintiffs consented either expressly or impliedly, to any

12   such acts or conduct as may be shown on the part of this answering defendant.

13                             SIXTEENTH AFFIRMATIVE DEFENSE

14           AS AND FOR A SIXTEENTH, SEPARATE AND DISTINCT DEFENSE, DEFENDANT

15   ALLEGES:

16           This answering defendant is immune from liability pursuant to the provisions of §§ 815, 815.2,

17   818, 820.2, 820.4, 820.6, 820.8, 820.9, 821.6, 844.6, and 845.6 of the Government Code of the State of

18   California.

19                             SEVENTEENTH AFFIRMATIVE DEFENSE

20           AS AND FOR A SEVENTEENTH, SEPARATE AND DISTINCT DEFENSE, DEFENDANT

21   ALLEGES:

22           The facts alleged in the Complaint do not involve any custom, practice, procedure or regulation

23   of defendant, which gives rise to a violation of a constitutional right pursuant to Monell v. New York

24   City Department of Social Services, 436 U.S. 658 (1978).

25

26                                      **JURY DEMAND**

27

28           Defendants hereby demand a jury trial in this action.

-9-

1

2          WHEREFORE, defendant prays that plaintiffs takes nothing by way of the complaint on file

3   herein and that defendant has judgment for its costs, attorneys' fees and for such other and further relief

4   as the court deems proper.

5

6          Dated: October 18, 2007.

7                                           LOW, BALL & LYNCH

8

9                                   By   /s/   Dale L. Allen, Jr.
                                         DALE L. ALLEN, JR.
10                                       DIRK D. LARSEN
                                         Attorneys for Defendant
11                                       CITY OF CLEARLAKE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-10-

Exhibit 3

# Golden Gate Reporting

Page 1

IN THE UNITED STATES DISTRICT COURT FOR

THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

David Davis and Page       Case No.:  C 07-3365 EDL
Gearhart-Davis PRO SE,

           Plaintiffs,

  vs.

Clearlake Police
Department,

           Defendant.
_____/

DEPOSITION OF DAVID DAVIS

DATE:        May 6, 2008

TIME:        10:33 a.m.

LOCATION:    600 Administration Drive
             Law Library, Room 213 J
             Santa Rosa, California 95401

REPORTED BY: Cindy L. Boccaleoni
             Certified Shorthand Reporter
             License Number 12987

Golden Gate Reporting

```
 1              A P P E A R A N C E S

 2

 3    For the Plaintiffs:

 4            David Davis, Pro Se

 5            P.O. Box 3225
              Clearlake, California 95422
 6

 7    For the Defendants:

 8            DALE L. ALLEN, JR., ESQ.

 9            LOW, BALL & LYNCH
              505 Montgomery Street, 7th Floor
10            San Francisco, California 94111-2584
              (415) 981-6630
11            (415) 982-1634
              DAllen@lowball.com
12

13                      --oOo--

14

15

16

17

18

19

20

21

22

23

24

25
```

3dabddcd-37dd-4dfe-8aee-03cd38734669

## Golden Gate Reporting

Page 3

```
 1                   I N D E X

 2

 3    EXAMINATION BY:                    PAGE:

 4         MR. ALLEN                       4

 5

 6                E X H I B I T S

 7    Defendant's Exhibit:

 8                  None marked

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## Golden Gate Reporting

1    have to take into account that, hey, a person

2    that's been in that situation avoids police

3    officers and any confrontations with the police.

4    That's obvious.  That's just from experience.

5    Hey, I don't want no problem with the police

6    officers, you know.

7           So hey, I provided them with everything

8    that was required, you know.  Celli says, "Hey"

9    -- all he wanted to know, "Hey, man.  Where is

10   your license plates?"

11          Well, in fact, there's no way you can

12   see the license plates on a 1967 Cougar.  There's

13   no way possible because in order to pump gas into

14   a 1967 Cougar, the license plates have to be

15   folded down, which the statements was later

16   changed in -- what was the officer's name, the

17   officer that was with Celli that night?  Miller,

18   the same officer who altered a tape from a court.

19          So, you know, it's not like, you know, I

20   approached these officers and just immediately

21   start harassing them.  I've never in my life

22   heard of anybody being approached while pumping

23   gas into a vehicle.

24          And hey, "We don't like you kind of

25   people out here."  I understand you're an

Golden Gate Reporting

1    incident itself in a little more detail.

2         A.   All right.

3         Q.   One of the officers came up.  You can't

4    remember which of the two first approached you.

5    And they -- according to your complaint, you said

6    they asked for your driver's license,

7    registration and proof of insurance?

8         A.   Yes.

9         Q.   Prior to them -- that officer asking you

10   for that, did he say anything else to you?  Did

11   he say anything to you first?

12        A.   About the whole incident, the way he

13   approached me was, "Hey, is this your car?  Do

14   you live out here?  What are you doing out here?"

15   This is how the whole conversation started.

16   There was no conversation about no license plates

17   until after the whole fact, after they searched

18   my vehicle and everything.

19        Q.   All right.  So first officer comes up

20   and says, "Is this your car?  Do you live out

21   here?  What are you doing out here?"  What did

22   you say back?

23        A.   I told him I just moved out here.

24        Q.   Then what did the officer do?

25        A.   Got out of the car, started looking

## Golden Gate Reporting

1    around the car.  By this time the other officer

2    walked up, looking around the car, looking inside

3    the car.  And at this time, this is when all the

4    verbal exchange -- verbal words started being

5    exchanged.  "Well, hey, we don't like you kind

6    .out here."

7          And I asked him, "Well, what do you

8    mean, my kind, my kind of people?  What are you

9    trying to say?"  I took that offensively.

10         Q.  Okay.  Let me --

11         A.  I admit that.  I took that very

12    offensively.

13         Q.  What I want to do is just go step by

14    step at the moment, all right, so you get a

15    chance to explain all of this.  I'm going to go

16    step by step.

17         You mentioned that the first officer

18    comes up and asks you some questions about your

19    car and where you live, and you say you just got

20    out here.  You said that he got out of his car.

21    Did that first officer drive his car over towards

22    you, or did he walk over towards you?

23         A.  To be honest with you, I can't recall.

24         Q.  Okay.  After he walked over to you and

25    asked you the question and you said you just

Golden Gate Reporting

Page 53

1      Q.   Can you think of anything else that

2   occurred that night right then and there before

3   the officers left that we haven't talked about?

4   For example -- let me go back -- did the officers

5   ever lay hands on you that night at that first

6   stop, search you?

7      A.   Well, he told me to sit on the curb,

8   which I refused to sit on the curb.

9      Q.   All right.  Did he make you sit on the

10  curb by putting his hands on you?

11     A.   No.  He told me, "You need to sit on

12  that curb over there."

13     Q.   And you refused?

14     A.   And I told him, "I ain't sitting on no

15  curb.  I didn't do nothing to deserve to sit on

16  no curb."

17     Q.   Did he search you that night?

18     A.   He searched my vehicle.

19     Q.   Did he actually physically go in the

20  vehicle or walk around the vehicle and shine his

21  light into the vehicle?

22     A.   He went and looked in my vehicle.

23     Q.   Did he open the doors?

24     A.   The door was already -- the driver's

25  side door was already open.

## Golden Gate Reporting

1      Q.   Did he stick his head in the car?

2      A.   Yes, he did.

3      Q.   Did he move anything around?

4      A.   No, he looked in.  I was standing at the

5   trunk.  All I seen was this officer looking

6   around all inside my vehicle.

7      Q.   Did you ever see him put his hands on

8   any of your items --

9      A.   I couldn't even see him.  I was standing

10  at the rear of the vehicle.

11     Q.   Did Miss Davis ever tell you she saw the

12  officer move any items in your car around?

13     A.   You would have to ask her that.

14     Q.   I think you answered this, but did you

15  ever see him open the glove box or any portion of

16  your car?

17     A.   I couldn't see him.  I just seen --

18  while I'm talking to the officer -- say, me and

19  him talking.  The car's right here.  I look back;

20  I see this officer looking all inside my car

21  through the driver's side.  I don't -- I didn't

22  consent to no search.

23          MR. ALLEN:  Why don't we take a break so

24  you can move your car.

25          (Recess).

## Golden Gate Reporting

1    vehicle not even 30 days previous to that.  And I

2    thought -- apparently I was under the wrong

3    assumption that when a tag says like, expires

4    June of '07 --

5         Q.  Mm-hmm.

6         A.  -- at the end of June it expires, so

7    come July, you're --

8         Q.  That's -- that's a specific date.

9         A.  Right.  That was my assumption of...

10        Q.  Tell me what Celli was doing with his

11   hand on the gun when he was next to you.

12        A.  The whole time he was just standing on

13   the passenger side right on my window with his

14   hands on his gun.  And when we first pulled up, I

15   told Page, "Immediately start blowing the horn."

16   The people directly in front came outside and

17   watched the whole thing.

18        Q.  Did you get their names?

19        A.  I have that.  I'll submit all that.

20        Q.  Do you have the names of the people?

21        A.  I don't have their names.  I went by

22   their house, spoke with them.  She's contacting

23   her son, who actually witnessed the whole thing,

24   so...

25        Q.  So the son witnessed it?

Golden Gate Reporting

1        A.   Matter of fact, Celli told him to go

2    back in the house.

3        Q.   Do you remember the address?

4        A.   I can get the address for you.

5        Q.   And there was a young man that watched

6    this?

7        A.   A young man and a woman.

8        Q.   Can you tell me about how old they were?

9        A.   No, I couldn't.  All I can do is tell

10   you they were European Caucasians.

11       Q.   I mean, were they adults or teenagers?

12       A.   Adults.  Adults.

13       Q.   When Celli was standing there with his

14   hand on his gun, what was he doing?  Did he have

15   it around the grip?  Did he ever take it out?

16   What did you see?

17       A.   No, he didn't take it out.  He just had

18   his hand placed on it, like, "Move, I'll bust a

19   cap on you."

20       Q.   Okay.  Did he ever say anything to you?

21       A.   No, the whole time he didn't say -- oh,

22   as a matter of fact, he ran my name through a

23   dispatch because I heard it through his little

24   walkie-talkie.

25       Q.   He never spoke to you, but you overheard

Exhibit 4

CLEARLAKE POLICE DEPARTMENT    CA017U200          CN    NONE
                TRAFFIC STOP    (60802006)              Page    1

CODE SEC:            4000A VC    Unregistered vehicle
SECONDARY:           26710 VC    Defective windshield

DATE/TIME REPORTED:    Wed.    08/02/06 01:27 hrs.

DATE/TIME OCCURRED:    Wed.    08/02/06 01:27 hrs.
LOCATION OF OCCURENCE: 15010 LAKESHORE DR              BLOCK AREA:    24

SUSPECT-1:      DAVIS, DAVID MARSHALL          BM32  (07/08/74) 995-0749
OTHER ROLES:    DRIVER
ADDRESS:        3225 2ND STREET, Clearlake, CA 95422
DL NO./STATE:   D5847841/CA                                AR NO.:      0
RACE: Black              SEX: M HT: 507    WT: 189    HAIR: BLK  EYES: BRO

VEHICLES INVOLVED:
SUSPECT-1:      GLD /GLD  1967 MERC COU CP 2SCBYDO  CA  2/ 6
                Involved Vehicle, Refer to narrative

DETAILS OF INVESTIGATION:

TRAFFIC STOP NOTES:

ON 8-2-06 AT ABOUT 0125 HOURS, SGT CELLI AND I HAD JUST COMPLETED A TRAFFIC STOP
ON PAUL DAWSON IN THE PARKING LOT OF THE FLYERS GAS STATION.  THERE WAS A GOLD
MERCURY COUGAR IN THE PARKING LOT ADJACENT TO PUMP NUMBER EIGHT AND FACING
TOWARDS LAKESHORE DRIVE.  THE VEHICLE HAD NO PLATES ON IT AND THERE WAS NO
TEMPORARY TAG IN THE WINDOW.

SGT CELLI DROVE OVER TO THE VEHICLE AND SPOKE TO DAVID MARSHALL DAVIS FROM HIS
PATROL CAR.  I COULD NOT TELL WHAT THEY WERE SAYING BUT IT WAS APPARENT THAT SGT
CELLI WAS INVESTIGATING FURTHER.  HE GOT OUT OF HIS PATROL CAR SO I DROVE OVER
WHERE THEY WERE AT.

I APPROACHED DAVID MARSHALL DAVIS WHO WAS ACCOMPANIED BY A FEMALE WHO SAID SHE
WAS HIS WIFE.  DAVID MARSHALL DAVIS WAS ANGRY AND MADE ACCUSATIONS THAT WE WERE
HARRASSING HIM SOLELY BECAUSE HE WAS BLACK.  DAVID MARSHALL DAVIS SAID THAT HE
WAS ALWAYS BEING STOPPED AND HARASSED BECAUSE HE WAS A BLACK MAN IN NICE CAR.
INITIALLY, I THOUGHT THAT DAVID MARSHALL DAVIS WAS A PACIFIC ISLANDER.

SGT CELLI ASKED DAVID MARSHALL DAVIS ABOUT HIS VEHICLE AND WHY IT DID NOT HAVE
ANY PLATES ON IT.  HE SAID THAT THE PAPERWORK WAS IN THE MAIL.

WHILE THIS CONVERSATION WAS GOING ON, I NOTICED THAT THE WINDSHIELD OF THE
VEHICLE WAS CRACKED HORIZONTALLY THROUGH THE DRIVER'S FIELD OF VIEW.  A
REGISTRATION CHECK REVEALED THAT THE VEHICLE REGISTRATION WAS EXPIRED IN 2005
AND THERE WAS A REGISTRATION IN PROCESS AS OF FEBRUARY 2006.

CLE 0003

CLEARLAKE POLICE DEPARTMENT  CA017u200                CN   NONE
        TRAFFIC STOP  (60802006)                 Page    2

DAVID MARSHALL DAVIS CONTINUED AN ACCUSATORY INSULTING TIRADE.  HE ACCUSED SGT
CELLI AND I OF BEING RACISTS AND SAID THAT HE WAS GOING TO COMPLAIN TO THE
N.A.A.C.P..  HE REFERRED TO SGT CELLI AND I AS PIGS AND HE MADE NUMEROUS
COMMENTS ABOUT MY "BUILD".  WE TRIED TO EXPLAIN TO DAVID MARSHALL DAVIS THAT WE
WOULD STOP ANYONE WHO DID NOT HAVE PLATES ON THE VEHICLE OR A TEMPORARY
REGISTRATION CARD AND THE STOP HAD NO RACIAL MOTIVATION.

DAVID MARSHALL DAVIS SAID THAT HE WAS ANGRY ABOUT BEING ASKED IF HE WAS ON
PAROLE OR PROBATION AND THAT WE WERE BEING RACISTS FOR ASKING HIM THIS QUESTION.
HE THEN TOLD US THAT HE HAD DONE PRISON TIME AND HE WAS OFF PAROLE.  HIS
DEMEANOR CHANGED FROM SOMEBODY WHO WAS ABSOLUTELY INSULTED BY EVEN BEING THOUGHT
OF AS A PERSON WHO MAY HAVE COMMITTED A CRIME IN THE PAST, TO A PERSON THAT WAS
BRAGGING ABOUT BEING A VIOLENT CONVICTED FELON.

IT WAS APPARENT TO ME THAT DAVID MARSHALL DAVIS WAS NOT GOING TO BE RECEPTIVE TO
A WARNING ABOUT THE REGISTRATION AND THE WINDSHIELD.  I ISSUED HIM A CITATION
FOR THE VIOLATION AND ADVISED HIM THAT HE COULD NOT DRIVE THE CAR AFTER 48 HOURS
UNLESS HE WAS ENROUTE TO AN AUTO REPAIR FACILITY.

CLOSED WITH CITATION ISSUED

REPORTED: 08/02/06 by OFFICER TODD MILLER          INCIDENT: 60802006
RECORDED: 08/02/06 by SHERRI D VANNEST             SUPPLEMENT:      0
REVIEWED:           by
Follow up? Yes/ /No/ /Copies to: DET./ / PROBATION . LCSO/ /OTHER/ /

CLE 0004

Exhibit 5



# CLEARLAKE POLICE DEPARTMENT
## INTEROFFICE MEMORANDUM

**Robert "Bob" Chalk**
**Chief of Police**

**DATE:** *August 29, 2006*

**TO:** *Chief of Police Robert Chalk*

**FROM:** *Captain Ron Larsen*

**SUBJECT:** *IA# 08-03-06/90/107/132/145*

## Complaint Information:

Complainant:
David Davis   DOB: 07-08-74
P.O. Box 3225
Clearlake, Ca. 95422
995-0749

## Officers Involved:

Sergeant Tim Celli
Officer Todd Miller
Officer Tim Hobbs
Officer Sarah Hardisty

## Officers Representative:

Todd Simonson, Atty at Law
Rains, Lucia and Wilkinson
2300 Contra Costa Blvd, Suite 230
Pleasant Hill, Ca 94523
(925)609-1690

On August 3, 2006, Sergeant Clausen took the attached personnel complaint form from Mr. David Davis. Mr. Davis, in his complaint, is alleging that on two different occasions, officers harassed , offended and generally picked on him, also alleging that the incidents were racially motivated.

On August 2, 2006, Mr. Davis came to the police department and I spoke with he and his wife. He was alleging then that the officers had harassed him at Flyers that morning, and written him a ticket, and made inappropriate comments to him. He stated that the officers had someone else stopped when he pulled in, and claimed that they let that person go in order to bother him. He stated that they began to question him as to what he was doing there, where he lived, if he was on probation or parole. He also said that one officer told him that he did not like, "your kind of people". And that he could not wait 49 hours. (Reference to a citation issued for a defective windshield.) Mr. Davis initially stated that he wanted to file a complaint against the

R-3

(2)

officers. He also told me that he had previously been stopped and warned about the violations on the vehicle. I asked him if he knew the names of the officers, and he stated that he did not. I asked him if he had the ticket that he was issued and he told me that he had thrown it away. The description he was able to provide of the officers identified them as Sgt. Celli and Officer T. Miller.

Mr. Davis then told me that he would not file a complaint against the officers if he had the opportunity to speak with them and try to straighten the situation out. He left the station.

I left a note for Sergeant Celli advising him of Davis' contentions, and that he would like to speak to him and Officer T. Miller. Sgt. Celli left me a note the next morning, declining to meet with Davis, and outlining the events of the night before as he had seen them. (Attached)

On August 3, 2006, Davis returned to the police department and wanted to file a formal complaint. I had Sgt. Clausen sit down with him and take his complaint. (Attached) I also asked Sgt. Clausen to prepare a memorandum for me concerning his contact with Davis that day. (Attached)

In his written complaint, Mr. Davis alleges that the contact August 2, 2006 (Celli and T. Miller) was "offending". Though in the written complaint he does not go into as much detail as he did when he spoke with me. He did state "...I responded as well by calling this officer names, only a out of shape pig and from this point the 2 officers proceeded to harass me....". He stated that he left with a ticket for no tags and a damaged windshield.

He goes on to state that he and his wife were pulled over the next night "in retaliation". He stated that he was asked about his seat belt, had the handcuffs placed on him extremely tight, and placed in a police vehicle, where he had an asthma attack. Upon the arrival of rescue personnel he refused to go to the hospital, "because I was in fear for my life". He stated that he had "scares" (scars) from the handcuffs.

The officer who stopped Mr. Davis on 8-3-06 was Officer Hobbs. Officer Hardisty arrived on the scene shortly after the stop, though Mr. Davis does not mention Officer Hardisty in any manner in his complaint. Sergeant Celli arrived sometime later, upon learning the Officer Hobbs was in contact with Mr. Davis.

Regarding the first incident with Mr. Davis, Sergeant Celli completed the attached memorandum, and forwarded it to me, along with a copy of Officer Todd Millers notes from the computer system regarding the stop. Officer Miller's notes are under the incident number with no case number assigned. This is a common practice for Officer Miller to make notes concerning his citation under the incident number, to have a reference should the citation be contested in court. Both of these documents are attached to this report.

Sergeant Celli also forwarded me a memorandum concerning the stop of Mrs. Davis, with Mr. Davis as passenger on 8-3-06 by Officer Hobbs. Celli also provided me with a tape recording of the contact with Davis on 8-3-06 which he initiated upon his arrival at the scene. In addition, Officer Hobbs prepared report #06-2456 concerning the incident. (both attached).

## Investigation

On August 8, 2006 I noticed Sergeant Celli, Officer T. Miller, Officer Hobbs, and Officer Hardisty of the complaint and subsequent investigation. Copies of said notices are attached.

I reviewed again the complaint by Mr. Davis and compared the complaint with the information he had verbally provided to me concerning the incident on August 2nd. The information contained on his written complaint was less detailed than that he had verbally given me.

Based on police logs, and the information provided to me by Sergeant Celli, I was able to identify the involved officers as Sgt. Celli, Off's T. Miller, Hobbs, and Hardisty.

On August 11, 2006, I noticed the above officers of the date and times that they are to report to the police department to be interviewed in relation to this investigation. The date of the interviews is tentatively set for Thursday, August 24th, 2006, with the times varying from 1:00 p.m. to 3:10 p.m.

On August 22, 2006, I confirmed with all four officers' LDF representative, Todd Simonson that he would be available for the scheduled interviews with the officers on August 24, 2006.

(3)

Sergeant Celli, Officers T. Miller, Hardisty and Hobbs were all interviewed regarding this complaint on Thursday, August 24th, 2006 at the Clearlake Police Department. The four employees were all represented by LDF panel attorney Todd Simonson. All four employees were given a "Lybarger" admonition, ordering them to answer questions regarding this investigation and complaint. All signed the printed admonition, as did Mr. Simonson. All of the interviews were recorded by both myself and Mr. Simonson. Mr. Simonson retained possession of his recordings, and mine have been included with this file.

Sergeant Tim Celli was interviewed first. In synopsis, Sergeant Celli told us that he had been covering Officer Todd Miller on a traffic stop at the Flyers gas station when this incident occurred in the early morning hours of August 2, 2006. He stated that Miller had stopped and was issuing a citation to a P.J. Dawson. As the stop was completed he drove through the lot of the station and saw an older Cougar with no plates or stickers on it. He said he drove over and asked the male by the vehicle something like, "What happened to your plates?" He stated that the response was similar to, "I am tired of you guys fucking with me." Sgt. Celli said that he then got out of his car and was going to further the contact with this individual (Mr. Davis). Officer Miller also approached their location then. Sergeant Celli stated that during this contact/investigation of the vehicle status Mr. Davis was "constantly chipping", using foul language and seemed to focus on the stature of Officer Miller, telling him he should be "ashamed" calling him a "short fat pig". I asked him if Officer Miller had told Davis that "his kind" of people around here, and he stated that Officer Miller did say that. I asked him to explain the context and he said that Davis said that "there are more people like me coming here", and Officer Miller told he that "we don't want more people like you", to which Davis immediately responded, "Black people" and began calling them racists some more. Sergeant Celli then explained that Officer Miller told him he was talking about people with bad attitudes, and continued to try to explain, but Mr. Davis kept calling them racists. I then asked him to explain the comment about "cant wait 49 hours" made by Officer Miller. Sergeant Celli explained that Officer Miller had told Davis that the vehicle could not operated after 48 hrs., except to a repair shop, due to the defective windshield. He said that Officer Miller made some comment about not wanting to see the vehicle on the road after 48 hours. He stated that both he and Officer Miller cleared the stop then, as Mr. Davis had received his citation, and their business was done, though Davis continued, "chipping."

Sergeant Celli was also present on August 3, 2006 for part of the interaction with Mr. Davis and Officer Hobbs. He advised me that he had heard Officer Hobbs run a check on Mr. Davis over the radio. He spoke with Officer Hobbs on the phone and advised him to record his contact with Davis. He said that Officer Hobbs told him at that time that Mr. Davis was not cooperative, and had been detained in handcuffs. Hobbs also told him that he did not have a recording device. Sgt. Celli then stated that he heard Officer Hobbs call for rescue, so he asked Hobbs if he needed assistance, and he told him that he did. Sergeant Celli then responded to the location of the stop, arriving before rescue personnel. Sergeant Celli stated that upon his arrival at the scene Mr. Davis was next to the patrol car kneeling on the ground and breathing heavily. He stated that he asked Officer Hobbs what happened and was told that as he was preparing to release him Davis complained of an asthma attack, so he called rescue. Sgt. Celli stated that Davis was not handcuffed at this time. Celli said that Officer Hardisty was also present at the stop, but he witnessed no interaction between Hardisty and Mr. Davis.

I asked Sgt. Celli if Mr. Davis was in the same vehicle as the previous night, he stated that "no" they were in white Suburban, and he assumes that Mrs. Davis had been driving, as she had been cited by Officer Hobbs for being an unlicensed driver. Sgt. Celli said that rescue personnel arrived about 5 minutes after he had. He also said that Mr. Davis was refusing to sign the citation, and that he explained to him that if he refused to sign he would be taken to jail. Davis eventually signed the citation. He was walked over to the ambulance, and refused medical aid or transport, and at this time he appeared to be physically fine. Mr. and Mrs. Davis left the scene of the stop shortly thereafter.

I asked Sergeant Celli if the two memorandums provided to me under his signature were his, and if the information in each memo was accurate. He stated that they were accurate. I asked if either he or his representative had any objection to my inclusion of the memorandums with the I.A. investigation, and there was no objection, hence both memorandums by Sergeant Celli are incorporated into this report and investigation.

(4)

I next interviewed Officer Sarah Hardisty, again in the presence of Mr. Simonson. Officer Hardisty stated that she was on duty on August 3, 2006 in the early morning hours, and that she was in the final phase of her field training program, with Officer Hobbs as her training officer. She was in her own car, with Officer Hobbs acting as a "shadow" officer. She stated that when Officer Hobbs stopped the Davis' she responded to the location of the stop, arriving within 1 ½ and two minutes after the stop.

When she arrived, Mr. Davis was still seated in the passenger side of the car, and she approached that side of the car, as Hobbs was at the drivers side. She stated that Mr. Davis appeared agitated, and was fumbling around with something in the glove box. She said that Officer Hobbs came around to the passenger side of the car and had him get out, too him back to the patrol car and handcuffed him, placing him in the rear of the patrol car.

Officer Hardisty stated the Mr. Davis took a couple of deep breaths and said he may have an asthma attack. Officer Hobbs took him out of the patrol car and uncuffed him. She said he then fell to the ground, and they called for rescue. Mr. Davis made a statement that he was diagnosed as a paranoid schizophrenic and asthmatic. Officer Hardisty stated that she did not see any signs of distress present in Mr. Davis.

Officer Hardisty said that prior to rescue arriving at the scene she took the citation that Officer Hobbs had completed for Mrs. Davis and had her sign the citation.

I asked Officer Hardisty to describe the vehicle that the Davis' were in and she stated that it was a white SUV type vehicle. I then asked her if she knew or was familiar with Mr. or Mrs. Davis, and she stated that she was not. I then asked her if anyone had pointed out the Davis', described either of them to her, and or suggest that she stop, harass, arrest, or cite either of them? She stated "no". I also asked her if any of the officers present did anything out of line in the handling of the stop of the Davis', and she again stated "no".

Officer Tim Hobbs was interviewed next, again in the presence of Mr. Simonson. Hobbs stated that he had been on duty on August 3, 2006 in the early morning hours. He stated that Officer Hardisty arrived at the location of the stop within about a minute of his stopping the vehicle. He stated that he stopped Mr. and Mrs. Davis in the area of Modoc and Sonoma for expired registration, a stop sign violation, and not using the turn signal. Hobbs also stated that upon approaching the vehicle, a white Suburban, that he noticed that the male passenger was not wearing a seat belt. The female driver produced a Florida I.D. card, and stated that she was unlicensed. Hobbs then attempted to identify the male for the seat belt violation, and he told Hobbs that he had no I.D. Officer Hobbs said that he asked the passenger a couple more times for his name, with no response, then he mumbled something like, "what the fuck". He also made some type of comments about being harassed. Eventually the passenger handed him some type of court paper and said, "get if from there".

At this time Officer Hobbs went around the car and had the passenger exit the vehicle, detained and handcuffed him and placed him in the rear of the patrol car, to facilitate his identification. He finally identified himself as Davis with a date of birth, so Hobbs ran both of them. Mr. Davis began complaining of an asthma attack, and said he needed to go to the hospital. He also stated that he was a paranoid schizophrenic. Hobbs called for rescue to respond.

Officer Hobbs said that Sgt. Celli called him on the cell phone and told him that there had been an incident the previous night with Davis, and told Hobbs he should record their encounter. Hobbs did not have a recorder. Officer Hobbs said that he had Mr. Davis get out of the car and removed one of the handcuffs, and he began jerking around and fell to the ground, and Hobbs was finally able to remove the other handcuff. He also completed a citation for Mr. Davis for not wearing the seatbelt. Upon the arrival of rescue personnel Mr. Davis refused transport or medical aid. Mr. Davis eventually signed the citation, and he and his wife left the area.

Officer Hobbs said that upon the arrival of Sgt. Celli Mr. Davis made some derogatory remark about seeing Sergeant Celli again.

I asked Officer Hobbs if he was familiar with or knew either Mr. or Mrs. Davis prior to the stop, and he stated that he did not. I also asked him if anyone had pointed out either Mr. or Mrs. Davis or described him or her to him and suggest that he stop, harass, arrest, or cite either one of them, and he stated "no". I asked Officer Hobbs if he had taken any action with Mr. Davis because of his race/ethnicity that he would not have taken with anyone else, and he stated "no". He also stated that he had been made aware at briefing that there had been some type of incident with an individual the night before, but that he did not know who it was with, or what it was really about.

(5)

I then asked Officer Hobbs if he had been working the night before (August 2nd, 2006) and he stated that he had not, that it was his night off.

Officer Hobbs had prepared CPD report #06-2456 regarding this encounter. I asked him if the report was true and accurate, and he indicated that it was. I asked if he or his representative had an objection to this report being included as part of the I.A., and neither objected.

The final interview was with Officer Todd Miller, again with his representative, Todd Simonson. Officer Miller indicated that he was on duty in the early morning hours of August 2, 2006. I asked him to explain his presence at the Flyers station early that morning. He indicated that he had made a traffic stop in the parking lot and was in the process of issuing a citation. I asked him about the contact with Mr. Davis. He told me that he was finishing or had just finished the traffic citation, when Sergeant Celli made contact with a male near a gold Cougar in the lot. Officer Miller said that Celli was talking to the male from inside his patrol car, then he exited the car. He then drove over and joined Sgt. Celli. He said that he noticed that the Cougar had no plates or window sticker, and a cracked windshield.

Officer Miller stated that Mr. Davis was confrontational from the beginning of the contact. He said that Sgt Celli asked Mr. Davis if he was on probation or parole, and Davis' response was to accuse the officer of picking on him because he was "a black man with a nice car".

Officer Miller said that Mr. Davis told him he had been warned several times about the car, so it was apparent to Officer Miller that being warned about the violations was not sufficient for him to get it repaired, so he felt a citation was in order. Officer Miller stated that Mr. Davis told him the "you guys need to change your ways, there are more people like me coming up here all the time". Officer Miller said that he replied by saying "We don't want people like you here", to which Mr. Davis replied, "Black"?, to which Officer Miller stated that he replied "no, confrontational and violating the laws." He also said that he admonished Mr. Davis about driving the car after 48 hours with the defective windshield, and that it would be cited and towed.

I asked Officer Miller if he took any action or made any comments to Mr. Davis because of his race/ethnicity that he would not have made to anyone else, and he told me, "no".

I then asked Officer Miller to detail from me his normal practice after issuing a citation for making notes of the contact/cite for later use. He told me that he will almost always make a narrative entry under the incident number issued for the citation. I asked him if he did so in this case, and he stated that he had. I then showed him the incident print out for the citation issued to Mr. Davis and asked him if it was his, and accurate. He stated that it was. Neither he nor his representative objected to the inclusion of the incident report with this investigation.

I further asked him if he had prepared a similar documentation regarding the citation he had issued just prior to the contact with Mr. Davis, and he stated that he believed he did. I showed him a print out of incident #60802005 and asked him if that were a copy of those notes, and he stated that it was. Once again that document is included in this report without objection.

We then discussed the citation he issued just prior to the contact with Mr. Davis. Officer Miller indicated that the citation was issued for no current registration and for no proof of insurance. Mr. Davis was cited for an unregistered vehicle and a defective windshield. In both instances the contacts were made for the registration violations, and both drivers were ultimately issued citations for similar offenses. Mr. Davis' contended that he was harassed because of his race. The first citation was issued to Paul J. Dawson, who is a white male.

**Analysis:**

Ronald D. Larsen- Captain