**EXHIBIT A**

## Golden Gate Reporting

IN THE UNITED STATES DISTRICT COURT FOR

THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


David Davis and Page          Case No.:  C 07-3365 EDL
Gearhart-Davis PRO SE,

             Plaintiffs,

    vs.

Clearlake Police
Department,

             Defendant.
_____/



DEPOSITION OF DAVID DAVIS




DATE:          May 6, 2008


TIME:          10:33 a.m.


LOCATION:      600 Administration Drive
               Law Library, Room 213 J
               Santa Rosa, California 95401

REPORTED BY:   Cindy L. Boccaleoni
               Certified Shorthand Reporter
               License Number 12987

Golden Gate Reporting

Page 2

1                     A P P E A R A N C E S

2

3    For the Plaintiffs:

4            David Davis, Pro Se

5            P.O. Box 3225
             Clearlake, California 95422
6

7    For the Defendants:

8            DALE L. ALLEN, JR., ESQ.

9            LOW, BALL & LYNCH
             505 Montgomery Street, 7th Floor
10           San Francisco,California 94111-2584
             (415) 981-6630
11           (415) 982-1634
             DAllen@lowball.com
12

13                      --oOo--

14

15

16

17

18

19

20

21

22

23

24

25

Golden Gate Reporting

Page 3

```
1                    I N D E X

2

3   EXAMINATION BY:                        PAGE:

4        MR. ALLEN                          4

5

6                E X H I B I T S

7   Defendant's Exhibit:

8                None marked

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## Golden Gate Reporting

Page 25

```
1        Q.   "Daytime" is fine.

2             What vehicle were you driving?

3        A.   My root-beer-brown Cougar.

4        Q.   So prior to August 2nd, 2006, there were

5   at least two encounters.  Do you recall any other

6   encounters with Clearlake Police Department prior

7   to August of '06?

8        A.   I seen them just riding around, but, you

9   know, as far as, "Hey, come here.  What's your

10  name?  You look suspicious," no.

11       Q.   Okay.  So the first -- in August -- on

12  August 2, 2006, Clearlake Police Department

13  officers contacted you; is that correct?

14       A.   Yes, they approached me.

15       Q.   Okay.  What were you doing at the time?

16       A.   Well, as I pulled into the gas station,

17  I noticed two officers had a gentleman pulled

18  over in a truck.  I got out of my vehicle.  Page

19  went into the gas station to pay for the gas.  I

20  believe it was like 25, $30.  I was filling the

21  tank up.

22            And she came out and put the gas nozzle

23  in the vehicle.  As it was pumping -- and we were

24  standing on the side watching these officers as I

25  noticed him watching me.
```

3dabddcd-37dd-4dfe-8aee-03cd38734669

1       Q.   Mm-hmm.  Keep going.

2       A.   One of them approached me, asked me, "Is

3    this your car?  Do you live out here?  What are

4    you doing out here?  Do you have driver's

5    license, registration?"  I provided them with

6    license, proof of insurance, and showed them

7    proof that the vehicle was, in fact, in the

8    process of being registered.

9            And then that's when the whole thing

10   brought on about, "Hey, we don't like your kind

11   out here," you know, "You need to move," you

12   know, as they admitted to in some of their

13   statements, which was later altered and changed.

14           I do admit that after those words, after

15   he told me that "We don't like your kind" and

16   that "You need to move," I took that very

17   offensively and felt that this officer was being

18   very unprofessional and disrespectful.

19           So I disrespected him back, not in a

20   threatening manner, just in a way as, "Hey, look.

21   You know, you just can't talk to people like that

22   because you're in a police uniform."  You can't

23   just walk up to people and tell them, "Hey, we

24   don't like you kind of people out here."  To me,

25   that's profiling.  That's racism right there, my

1    personal opinion, for somebody to tell you, "Hey,

2    we don't like your kind of people out here and

3    you need to move."

4         Q.  Do you remember the officer's name that

5    approached you first?

6         A.  To be honest with you, no, I don't.

7         Q.  Do you remember if it was Celli?  Was

8    Celli in uniform that night?

9         A.  Both officers were in uniform, and they

10   were in two separate cars.

11        Q.  Okay.  The officer that approached you,

12   was it the officer wearing the stripes, the one

13   who first walked up to you?

14        A.  To be honest with you, I don't recall.

15        Q.  Do you remember which officer made the

16   comments to you regarding "We don't like your

17   kind here"?

18        A.  Well, both -- Miller was the one that

19   initially started the whole "Hey, we don't like

20   you kind of people out here, and you need to

21   move."  And from that point, you know, it was

22   just a bunch of bickering and nagging going on.

23            To be honest with you, Dale, you know,

24   okay, fine.  You can bring up the point that hey,

25   you know, I'm a convicted felon.  But you also

Golden Gate Reporting

Page 28

1     have to take into account that, hey, a person

2     that's been in that situation avoids police

3     officers and any confrontations with the police.

4     That's obvious.  That's just from experience.

5     Hey, I don't want no problem with the police

6     officers, you know.

7            So hey, I provided them with everything

8     that was required, you know.  Celli says, "Hey"

9     -- all he wanted to know, "Hey, man.  Where is

10    your license plates?"

11           Well, in fact, there's no way you can

12    see the license plates on a 1967 Cougar.  There's

13    no way possible because in order to pump gas into

14    a 1967 Cougar, the license plates have to be

15    folded down, which the statements was later

16    changed in -- what was the officer's name, the

17    officer that was with Celli that night?  Miller,

18    the same officer who altered a tape from a court.

19           So, you know, it's not like, you know, I

20    approached these officers and just immediately

21    start harassing them.  I've never in my life

22    heard of anybody being approached while pumping

23    gas into a vehicle.

24           And hey, "We don't like you kind of

25    people out here."  I understand you're an

Golden Gate Reporting

1   incident itself in a little more detail.

2        A.  All right.

3        Q.  One of the officers came up.  You can't

4   remember which of the two first approached you.

5   And they -- according to your complaint, you said

6   they asked for your driver's license,

7   registration and proof of insurance?

8        A.  Yes.

9        Q.  Prior to them -- that officer asking you

10  for that, did he say anything else to you?  Did

11  he say anything to you first?

12       A.  About the whole incident, the way he

13  approached me was, "Hey, is this your car?  Do

14  you live out here?  What are you doing out here?"

15  This is how the whole conversation started.

16  There was no conversation about no license plates

17  until after the whole fact, after they searched

18  my vehicle and everything.

19       Q.  All right.  So first officer comes up

20  and says, "Is this your car?  Do you live out

21  here?  What are you doing out here?"  What did

22  you say back?

23       A.  I told him I just moved out here.

24       Q.  Then what did the officer do?

25       A.  Got out of the car, started looking

Golden Gate Reporting

Page 31

1    around the car.  By this time the other officer

2    walked up, looking around the car, looking inside

3    the car.  And at this time, this is when all the

4    verbal exchange -- verbal words started being

5    exchanged.  "Well, hey, we don't like you kind

6    out here."

7              And I asked him, "Well, what do you

8    mean, my kind, my kind of people?  What are you

9    trying to say?"  I took that offensively.

10       Q.  Okay.  Let me --

11       A.  I admit that.  I took that very

12   offensively.

13       Q.  What I want to do is just go step by

14   step at the moment, all right, so you get a

15   chance to explain all of this.  I'm going to go

16   step by step.

17              You mentioned that the first officer

18   comes up and asks you some questions about your

19   car and where you live, and you say you just got

20   out here.  You said that he got out of his car.

21   Did that first officer drive his car over towards

22   you, or did he walk over towards you?

23       A.  To be honest with you, I can't recall.

24       Q.  Okay.  After he walked over to you and

25   asked you the question and you said you just

## Golden Gate Reporting

```
 1        Q.   That -- let's go to the temporary

 2   registration for the moment.   You had a temporary

 3   registration certificate that you showed the

 4   officers?

 5        A.   No, it was not a temporary registration.

 6   The officer asked me, "Do you have any proof to

 7   show that the vehicle is at least in process of

 8   being registered?"  And I provided him with it.

 9        Q.   What was this process of registration

10   that you showed him?

11        A.   Well, I just had a new motor put in it

12   and a new exhaust system, and it was still in the

13   process of nonoperating -- it was back and forth

14   from the automotive shop, basically.

15        Q.   So did you --

16        A.   And it was money being tangled up in the

17   automotive shop and through DMV.  It was like

18   $255 owed.   The reason -- part of the cost was

19   because the license plates on the vehicle, the

20   person I purchased the vehicle from, they were

21   personalized license plates.

22        Q.   Do you know -- do you know what a permit

23   of non-operation is, a PNO?

24        A.   Yes, I do.

25        Q.   Okay.   Was this vehicle -- did this
```

Page 42

1    vehicle hold a PNO at the time?

2        A.  No, I don't believe, no.

3        Q.  But the registration was expired on it?

4        A.  Yes.

5        Q.  And what you had was something you

6    showed them that you were in the process of

7    taking care of that expired registration?

8        A.  Yes, yes.

9        Q.  But it was not taken care of yet at the

10   time?

11       A.  That's what I stated.

12       Q.  Okay.  And then with -- you had

13   insurance?  You had a proof of insurance

14   certificate you showed them?

15       A.  Yes.

16       Q.  Do you still have that proof of

17   insurance?  Because -- let me back up for a

18   second.  In your complaint you attached an

19   exhibit, Exhibit A:  "Mercury Cougar was sold so

20   David Davis no longer has the registration and

21   insurance."

22           Do you have any evidence still at your

23   house where you have that vehicle's insurance on

24   August 2nd, '03 -- sorry -- August 2nd, '06?  Do

25   you have any evidence of the insurance policy in

## Golden Gate Reporting

Page 44

1    the --

2        A.   Because there was more stuff that I was

3    still going to bring over as well.

4        Q.   The proof of insurance that you had that

5    night, you showed it to the officers.  Did you

6    have proof of insurance in the car with you?

7        A.   Yes.

8        Q.   And you showed that to the officers?

9        A.   Yes.

10       Q.   And he still wrote a ticket that you

11   didn't have any insurance?

12       A.   He marked it off.  He wrote the ticket

13   up, telling me, "Hey, this is not insurance."

14   And you know, I'm showing this officer, "Hey,

15   look, man.  You can't write a ticket telling me I

16   don't have insurance when I'm showing you the

17   proof of insurance right here."

18       Q.   All right.  Okay.  Then they cited you

19   also for a cracked windshield?

20       A.   It wasn't a crack.  It was a line, I'd

21   say, five, six inches long on the bottom of the

22   windshield from the incident I was involved in,

23   the accident I was involved in a few months prior

24   to that.

25       Q.   How long was the line?

Golden Gate Reporting

1        A.   I'd say no longer than seven, seven

2    inches.

3        Q.   But what would you call this line?   Is

4    it cracked?  Is it a defect in the windshield?   I

5    mean, how would you categorize it?

6        A.   It would be a defect in the windshield.

7    I guess if it had a spider crack, it still would

8    be considered a defect.  I had a ticket for that

9    before.

10       Q.   Who gave you that ticket?

11       A.   This is way back, way back.

12       Q.   Not for that crack, but for another

13   crack on a different car?

14       A.   Yes, only this is --

15       Q.   Was it a similar type crack on the other

16   citation?

17       A.   No, it was a -- you know how a diesel on

18   the freeway throws a little rock and puts a

19   little --

20       Q.   Absolutely.

21       A.   Yeah.

22       Q.   And I'm watching the clock.

23            After they gave you the tickets --

24   during the course of the time they gave you the

25   ticket was when the comments were made about "We

Golden Gate Reporting

Page 46

1    don't want your kind here"?

2        A.  Before the tickets.

3        Q.  Before the tickets.

4            At any time did the officers direct any

5    profanity at you?

6        A.  Yes.

7        Q.  What kind of profanity?

8        A.  Is it common for a police officer to

9    tell somebody, "We don't like your kind of people

10   out here"?

11       Q.  Now, let me just make sure you're clear

12   on what I mean by "profanity."  You understand

13   what "profanity" is, as opposed to --

14       A.  Cuss words.

15       Q.  Cuss words.

16       A.  Yes, there was cuss words exchanged.  I

17   don't recall what cuss words was exchanged, but

18   hey, look, everybody cusses.  It's not like these

19   officers weren't cussing just as well.

20       Q.  What I'm getting at is that you cussed

21   and they cussed.  Both of you were cussing back

22   and forth?

23       A.  Yeah.

24       Q.  Okay.  Were any racial terms used by the

25   officers at you?

Golden Gate Reporting

Page 47

```
 1        A.  Mr. Allen --

 2        Q.  It's just a straightforward question.

 3   I'm not -- I understand that there was a verbal

 4   exchange taking place, and I understand that you

 5   felt that --

 6        A.  You don't consider that racial?

 7        Q.  What I'm looking for is specific racial

 8   words.  Did they call you a nigger?  Did they

 9   call you a boons -- call you a coon?

10        A.  Mr. Allen, don't disrespect me like

11   that.  I didn't call you a white European.

12        Q.  No.

13        A.  Don't call me a nigger.

14        Q.  That's not my point.  I'm not calling

15   you that.  What I'm asking you is, in your claim

16   you have a racial bias claim in here.  One way of

17   proving racial bias is that the officers used

18   words like that.  So I need to know --

19        A.  If this officer is telling me, "We don't

20   like you kind of people, not only am I saying

21   this, but other witnesses in this community have

22   heard these officers say this about me."

23        Q.  We're going to talk about that later.

24   We are going to talk about that.

25        A.  To me, yes, that is racial.
```

## Golden Gate Reporting

Page 48

1      Q.   That's fine.   There's a distinction

2   here, all right?   The distinction is you can make

3   an effort to prove your case of racial animus

4   because they're directing actions towards you and

5   you feel they're directing them towards you

6   because you're black, right, or someone's Asian

7   or someone's Hispanic or someone's American --

8   native American Indian.

9           One way of proving it directly is if

10   they're using language that is commonly

11   understood in the community to be a derogatory

12   term for someone, such as calling -- use a '60s

13   term.   You're too young for this, but a '60s term

14   for a white guy is a "honkey."   All right?

15      A.   I know about that.

16      Q.   Or call them "trailer trash," you know,

17   and things like that that you'll often hear down

18   in the South for white -- poor white.   So that's

19   -- those are terms that can be construed and are

20   clear terms that people understand to be

21   derogatory terms that are racially motivated.   So

22   what I'm asking --

23      A.   Mr. Allen, I know a lot about racism.

24   You don't have to explain to me about honkeys,

25   white trash, like that -- niggers.   I know all

Golden Gate Reporting

1    about that.

2         Q.  I'm going to ask this question so --

3         A.  I'm well-experienced in that department.

4         Q.  I'm going to ask this question so we can

5    move on to the next area -- we can take a quick

6    break so the court reporter can move her car --

7    is -- did the officers use any derogatory racial

8    language towards you, specific language that you

9    understand to be racially derogatory?

10        A.  Once again, in my opinion, what this

11   officer told me, that "We do not like you kind of

12   people out here," was a racial statement.

13        Q.  That's clear in the record.  That's

14   clear in your pleadings, and that's clear on the

15   record.  My question is -- because you haven't

16   answered my question -- did they use any other

17   words or any other language?

18        A.  Probably behind my back.

19        Q.  No, did you hear -- but did you hear it?

20        A.  Mr. Allen.

21        Q.  You got to answer the question;

22   otherwise, we're not going to be able to continue

23   the deposition.

24        A.  I gave my answer for that.  To my

25   belief, in my opinion, what this officer stated

Page 50

1    to me was a racial statement.  That's my answer

2    to your question.

3         Q.  See, Mr. Davis, the thing we may need to

4    do -- really seriously need to do is continue

5    this deposition and I'll ask Judge LaPorte to

6    provide a courtroom, and we'll go do the

7    deposition down in the courtroom and then she can

8    come in from time to time and rule on your

9    objections, because you're posing an objection,

10   in essence, by not answering the question.

11        A.  Okay.  Let's move on.  No, I did not

12   hear this officer make any --

13        Q.  Racially --

14        A.  -- name-calling as far as the "N" word

15   or any other nicknames they come up with.  No, I

16   did not.

17        Q.  Thank you.

18        A.  Except for that statement that he made

19   and that he suggested that I move.

20        Q.  And that record's clear, and that's part

21   of your evidence.  I'm not objecting to that, and

22   I'm not saying that it isn't part of your case.

23   I need to complete my case.

24        A.  Okay.  Fine.

25        Q.  I need to get the whole circle, not just

Golden Gate Reporting

1    evening?

2        A.   No.

3        Q.   What car were you driving?

4        A.   On which occasion?

5        Q.   The second night, the second incident.

6        A.   I wasn't driving.

7        Q.   What car were you occupying?

8        A.   What was that?  A Chevy Suburban.

9        Q.   Was Page driving that?

10       A.   Yes.

11       Q.   And did you have contact with police

12   officers that evening?

13       A.   Yes.

14       Q.   And what happened?

15       A.   Do you want me to go in detail, or just

16   something brief, fast, real quick?

17       Q.   Well, whatever you feel most comfortable

18   with.

19            Were you pulled over by the police?

20       A.   Well, as we approached a stop sign -- I

21   can't recall what street it is -- we noticed a

22   police officer parked down a dark dirt road.  As

23   soon as we proceeded through the stop sign, he

24   immediately got behind us, pulled us over.  I

25   want to say we turned the corner, I want to say,

Golden Gate Reporting

1    handcuffs.  At this time, this is when I noticed

2    Celli standing over me.

3    BY MR. ALLEN:

4        Q.  When Hobbs came up to you and asked you

5    for identification, you gave him the interim

6    driver's license from the night before?

7        A.  Yes, sir.

8        Q.  He said to you that this wasn't --

9        A.  He didn't even look at it.

10       Q.  All right.  And then he asked you to get

11   out of the car, or did he put --

12       A.  At first he asked me why didn't I have

13   the seatbelt on.  And you know, I told him, "Hey,

14   look, you don't reach for stuff when you see the

15   police walking up to the car."  You know, that's

16   a quick way to get, you know --

17       Q.  Were you wearing a seatbelt at the time

18   that the officer -- you were in the car and --

19       A.  No.  I admitted I didn't have a seatbelt

20   on.  No, I didn't have a seatbelt on.

21       Q.  After Hobbs cited you for the seatbelt,

22   is that when he asked you for the identification?

23       A.  Yeah, he asked me for my identification.

24   First he asked me, Hey, what's my problem, what's

25   my -- do I -- "What do you have an attitude for?

Page 76

```
 1        Q.   Okay.  Now -- but in the time between

 2    the asthma attack -- actually, from the moment

 3    you were stopped and Hardisty and Hobbs

 4    approached you and Page until the time the

 5    ambulance arrived, did any of those three

 6    officers at any time use any racially derogatory

 7    words directed at you or Page?  And this goes

 8    back to same stuff we talked about before.

 9        A.   Yeah, I know when -- when Hobbs placed

10    the handcuffs on me, he told me, "These are good

11    and rusty."

12        Q.   Okay.  And --

13        A.   But as far as the "N" word and --

14        Q.   Right.

15        A.   -- you know, all of those, you know, no.

16        Q.   Okay.

17        A.   I didn't -- I didn't hear him.

18        Q.   Okay.  And I'll ask Page the same

19    questions.  Now, the ambulance arrived, and in

20    your complaint you said one of reasons that you

21    refused to go in the ambulance, because you were

22    fearing for your life?

23        A.   Yes.

24        Q.   Why were you fearful for your life if

25    you went in the ambulance?
```

Page 83

1    Page Gearhart-Davis in fear to leave their home

2    during Sergeant Celli's evening shift."

3         Are these the three tickets you're

4    referring to where one was for the dirt bike?

5    A.    Yes, sir.

6    Q.    So when was the dirt bike ticket given,

7    approximately?

8    A.    09-27.

9    Q.    Okay.  On 09-27.  What happened on

10   09-27-06?

11   A.    While riding a dirt bike off-road.

12   Q.    Who?

13   A.    Me and Page.

14   Q.    Okay.  Are you on separate bikes or the

15   same bike?

16   A.    On the same dirt bike, 350 Yamaha.

17   Q.    Who was driving?

18   A.    I was driving.

19   Q.    Okay.

20   A.    On off-road.  Sergeant -- I mean -- not

21   Sergeant -- Officer Hobbs, riding down the street

22   on the side of the dirt trail coming the opposite

23   direction, seen us, made a U-turn, pulled us

24   over, wrote a ticket for unregistered vehicle,

25   driving out of class, littering.  It was a bunch

Golden Gate Reporting

1    of -- I can't -- it's probably written in there,

2    but the ticket was extremely, ridiculously long.

3    I mean, the ticket -- the judge fined me over

4    $1,200.

5        Q.   Did Celli come to the scene?

6        A.   He was there within minutes.

7        Q.   Okay.  And were you given one ticket

8    with a lot of violations or separate tickets?

9        A.   I was given a ticket, and Page was given

10   a ticket.

11       Q.   And do you remember what your ticket was

12   for?

13       A.   My ticket was for operating a vehicle

14   out of class -- which I explained to them you

15   don't need a driver's license to operate an

16   off-road vehicle, which he later stated, "Hey,

17   you were on this paved road, not on that dirt

18   trail that I just seen you on" -- littering,

19   unregistered dirt bike, no helmet.  And I believe

20   that will put the icing on the cake, I believe.

21       Q.   Littering?

22       A.   Yes.

23       Q.   And no helmet?

24       A.   Yes.

25       Q.   And unregistered dirt bike?

Golden Gate Reporting

1    A.  Yes.  I'll be sending that too, the

2  registration, to show that it was registered, in

3  fact.

4    Q.  Okay.

5    A.  Well, he seen the ticket.

6    Q.  Do you know what Page was cited for?

7    A.  No helmet.

8        THE REPORTER:  "No" what?

9        THE WITNESS:  No helmet.

10        And I believe -- I don't want to speak

11  for her ticket.  I'm not absolutely sure.  But I

12  do know one of them was -- I believe was no

13  helmet.  I can't recall the other, if there was

14  another one.

15  BY MR. ALLEN:

16    Q.  Were these tickets dismissed, or were

17  they found -- were you found guilty on those

18  tickets?

19    A.  What's so crazy about that is that was

20  the first ticket the judge heard, and he judged

21  me without hearing the other cases and found me

22  guilty on all of them, but after he heard the

23  other tickets, he seen the pattern and dismissed

24  them like he dismissed the incident from the

25  night at the gas station.

Golden Gate Reporting

Page 86

1      Q.   So guilty on the motorcycle; dismissed

2  on the other cases?

3      A.   Dismissed on 08-02, suspended on the

4  seatbelt.

5      Q.   What did that mean, by the way?  I

6  didn't understand that.

7      A.   What's that?

8      Q.   "Suspended on the seatbelt"?

9      A.   Suspended fine, as far as paying the

10  fine.  He racked me up good that day in court.

11      Q.   Okay.  So he ended up fining you for the

12  motorcycle, dismissing the 08-02 citations, and

13  then he dismissed 08-03 except for the seatbelt;

14  he just didn't fine you for it?

15      A.   Yes.  No, he -- yeah, he didn't dismiss

16  it.  He just didn't fine me for it.

17      Q.   Was Page fined for the 08-03 ticket or

18  given a fix-it?

19      A.   08-03 ticket.

20      Q.   That was the one you were driving?

21      A.   I believe -- I'm not absolutely sure.  I

22  don't know if it was a fix-it ticket or --

23      Q.   I'll ask her.

24      A.   I have no idea.

25      Q.   I'll ask her.

Page 89

1       Q.   We're going to do that next.

2       A.   And then the allegedly 911 phone call

3    from my home.

4       Q.   But that was in January; that was later?

5       A.   No, that -- yeah, they said it was in

6    January.

7       Q.   What I'm doing is, I'm just working --

8       A.   Working down it, okay.

9       Q.   -- working through your complaint.

10      A.   Okay.

11      Q.   So your complaint says there was

12   constant harassment.  You've detailed -- you've

13   told us what it was up until now.  Anything else

14   where Celli had contact with you or your wife

15   prior to December 27th?

16      A.   No.

17      Q.   Okay.  On December 27th you and your

18   wife saw Celli and an Officer Labbe parked.

19      A.   Labbe.

20      Q.   Labbe, Labbe.

21      A.   That's what I called him, and he got

22   mad.

23      Q.   And when you went past them, they pulled

24   you over.  They pulled you over, correct?

25      A.   Yes.

Golden Gate Reporting

1      Q.   And what car were you driving?  Or what

2   car -- who was driving?

3      A.   Page was driving.

4      Q.   And what car was she driving?

5      A.   A van.

6      Q.   Okay.  Do you remember the kind of van

7   it was?

8      A.   It was a van -- door -- traveling van.

9      Q.   So a panel van?

10     A.   Yeah -- no, not a panel van.  It was

11   like a vacation van.

12     Q.   Did it have windows around it?

13     A.   Yeah, windows and...

14     Q.   Anyone else in the car besides you and

15   Page?

16     A.   On 12-27 I could -- I might -- I could

17   say -- I don't want to -- I could think my kids

18   were in the vehicle, as well.

19     Q.   Do you remember about what time of the

20   day or evening it was or night?

21     A.   It was -- it was on Sergeant Celli's

22   shift, so I was -- it was on his shift.

23     Q.   Was it still daylight or was it

24   nighttime?

25     A.   It was just getting --

Page 91

1        Q.   Dusk?

2        A.   -- dark, yes.

3        Q.   And did they -- who approached,

4   Sergeant Celli or Officer Labbe?

5        A.   Labbe.

6        Q.   Labbe.

7        A.   Labbe approached Page.  Celli approached

8   my side with his hands on his gun.

9        Q.   Okay.   Labbe give Page a ticket?

10       A.   Yes.

11       Q.   And do you know what the ticket was for?

12       A.   Allegedly obstruction of license plates.

13       Q.   That was the ball hitch?

14       A.   Yes.   I'll send you a picture to show

15   that there's --

16       Q.   That's okay.

17       A.   -- no way possible a ball hitch could

18   obstruct the license plate.

19       Q.   The turn signal?

20       A.   Have you -- you've been out to

21   Clearlake, right?

22       Q.   Yeah.   But I'm just asking, did he give

23   her a ticket for not using the turn signal, not

24   whether she did or she didn't.

25       A.   I think he gave her a warning on that, I

Golden Gate Reporting

Page 92

1    believe.

2         Q.  Okay.  Did you hear -- was there --

3    there was a conversation between Officer Labbe

4    and your wife?

5         A.  Yes, it was right -- I heard everything.

6         Q.  Did he disrespect her in any way during

7    that conversation?

8         A.  He lied.

9         Q.  Beside that?

10        A.  No.  Labbe is a -- to me, to be honest

11   with you, he's a perfectly fine officer.  He was

12   just manipulated on that particular night.  I

13   have no problems -- I'll state it for the record.

14   I have no problem with police officers.  I stay

15   away from them.  I don't give them no problem.  I

16   don't look for no problems from the police.  I do

17   believe police are needed in the community.  But

18   it is bad apples in the bunch.  We all know weeds

19   grow in gardens.

20        Q.  You want to get this done in time to get

21   home, you're going to have to --

22        A.  Oh, my bad.  My bad.  Okay.  I just had

23   to --

24        Q.  I got you.  I know.  There's times you

25   just have to get it off your chest.

Golden Gate Reporting

Page 93

1           You said Labbe lied.  What did he lie

2     about?

3         A.  Well, as we approached Lake Shore,

4     Officer Celli and Labbe were parked in the

5     parking lot across the street.  As we approached

6     Lake Shore, as we made a right turn, I seen them.

7     I'm looking dead at these two officers in two

8     different squad cars immediately pull out and

9     were like one or two cars behind us.  And as soon

10    as they had the opportunity to pull us over,

11    Labbe pulled us over.

12        Q.  Go ahead.

13        A.  And I asked him, "What did you pull us

14    over for?"  As soon as I seen Celli, I already

15    knew what time it was.  I was like, "Here we go

16    again."

17        Q.  Okay.  So did you ask him what you were

18    pulled over for?

19        A.  He alleged it was from a ball hitch and

20    not using the turn signal on the street that you

21    don't need --

22        Q.  Okay.

23        A.  Well, to my knowledge, I don't think you

24    need to put on a turn signal.  It would be

25    falsifying the direction to put on the turn

Page 94

1    signal.

2        Q.   Okay.  And he gave her a ticket for

3    expired registration?

4        A.   Expired registration, no proof of

5    insurance -- which we had just purchased that

6    vehicle not even 30 days previous to that, and

7    the license plates stated that the tags

8    expired -- well, you know, I assumed in the end

9    of December, but the tags apparently expired a

10   few days previous to this accident.  And Page had

11   showed him proof of insurance, and he still wrote

12   it on the ticket.  But we had it signed off from

13   the Lake County Sheriff and just ended up paying

14   $10.

15       Q.   For the lack of registration?

16       A.   No, for the --

17       Q.   For the fix-it ticket?

18       A.   He said the light was not working, but

19   it was working.

20       Q.   Okay.

21       A.   So it was a $10 fix-it ticket.

22       Q.   Were you able to produce that -- did

23   Page produce proof of valid registration to

24   Officer Labbe?

25       A.   Like I said, we had just purchased the